**UNITED STATES of America,**
**Libelant,**

**v.**

**An ARTICLE . . . CONSISTING OF 216 individually CARTONED BOTTLES, MORE OR LESS, of an Article Labeled in part: SUDDEN CHANGE, etc.**

**Hazel Bishop, Inc., now known as, Bishop Industries, Inc., Claimant.**

**No. 64 M 900.**

United States District Court
E. D. New York.
July 30, 1968.

30

Joseph P. Hoey, U. S. Atty., for the Eastern District of New York, Brooklyn, N. Y., for libelant; Carl Golden, Asst. U. S. Atty., of counsel.

Graham, McGuire & Campaign, New York City, for claimant; Andrew J. Graham, New York City, of counsel.

## OPINION AND ORDER

WEINSTEIN, District Judge.

Sudden Change is a lotion advertised to the public as providing a "Face Lift Without Surgery." Its chief ingredient is bovine albumin. Allowed to dry on the skin, it leaves a film which (1) masks imperfections, making the skin look smoother and (2) acts mechanically to smooth and firm the skin by tightening the surface. Both effects are temporary. There is apparently no absorption by, or changes in, skin tissue resulting from its applications; it washes off.

The case turns on whether the government is correct in its contention that Sudden Change is, within the meaning of the Federal Food, Drug, and Cosmetic Act, "a drug," "intended to affect the structure * * * of the body of man." 21 U.S.C. § 321(g) (1). Because we find that the statutory definition does

not include cosmetics of this kind, a summary judgment of dismissal must be granted.

## PROCEEDINGS

This civil in rem seizure action was instituted in May of 1964 in the United States District Court for the Southern District of Florida. Pursuant to Section 334 of the Federal Food, Drug, and Cosmetic Act, the United States filed a Libel of Information against cartons of Sudden Change manufactured by the claimant, Hazel Bishop, Inc., now know as Bishop, Industries, Inc. The article and labels and leaflets pertaining to it were seized. Claimant intervened and answered. On motion of the claimant, the action was removed to this Court some four years ago, but the articles seized remained in the possession of the United States Marshal for the Southern District of Florida.

The libel alleges that Sudden Change, having been shipped in interstate commerce, is:

(1) a "drug" within the meaning of 21 U.S.C. § 321(g) (3) [redesignated as 21 U.S.C. § 321(g) (1) (C) by Pub.L. No. 89–74, § 9(b) (1964), 79 Stat. 227 (1965)];

(2) a "new drug" within the meaning of 21 U.S.C. § 321(p), and hence shipped in violation of 21 U.S.C. § 355(a) since concededly no new drug application pursuant to 21 U.S.C. § 355(b) was filed or effective with respect to it; and

(3) a "misbranded drug"

(a) within the meaning of 21 U.S. C. § 352(a) in that its labeling contains false and misleading statements with respect to its effectiveness in eliminating facial wrinkles and giving a face lift without surgery; and

(b) within the meaning of 21 U.S. C. § 352(e) (1) (A) (ii) in that the label fails to bear the name of each active ingredient.

The answer admits that the article and its accompanying labeling were shipped in interstate commerce; that it was within the jurisdiction of the United States District Court for the Southern District of Florida where the libel was filed; and that it has a "temporary cosmetic effect on wrinkles." All other allegations are denied.

## JURISDICTION OVER THE SUBJECT MATTER

A preliminary question is presented by claimant's suggestion that this Court lacks jurisdiction of the res—and thereby of the case—since the articles seized have remained in the Southern District of Florida. The statute is silent on the subject of removing seized goods. Section 334(f) (1) of title 21 of the United States Code provides only that in the case of removal for trial:

"The clerk of the court from which removal is made shall promptly transmit to the court in which the case is to be tried all records in the case necessary in order that such court may exercise jurisdiction."

It has apparently been the general practice not to transfer the seized articles to the trial court. Developments in the Law—The Federal Food, Drug and Cosmetic Act, 67 Harv.L.Rev. 632, 709 (1954). See also Kleinfeld & Dickerman, Removal and Consolidation in Condemnation Proceedings, 2 Food Drug Cosmetic L.J. 197, 206 (1947). Nevertheless, no case has been found where a transferee court held it lacked jurisdiction because the goods remained in the district where they had been seized. Fettig Canning Co. v. Steckler, 188 F.2d 715 (7th Cir.), cert. denied, 341 U.S. 951, 71 S.Ct. 1019, 95 L.Ed. 1373 (1951), is not in point since that case involved a seizure based on adulteration rather than misbranding. By the terms of section 334 the former class of cases is not removable.

As the courts have recognized, an action such as this, commenced by seizure under the Federal Food, Drug, and Cosmetic Act, is not a true in rem action even though subsection (b) of section 334 of title 21 of the United States

Code provides that "the procedure in [seizure] cases * * * shall conform, as nearly as may be, to the procedure in admiralty." In 1966, Rule 1 of the Federal Rules of Civil Procedure was amended to "abolish the distinction between civil actions and suits in admiralty." Advisory Committee on Admiralty Rules of the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States. Even prior to 1966, however, the courts had restricted the applicability of this phrase to the initial seizure. Once the seizure was complete, the courts held that the action was transformed into an ordinary action at law. See, e. g., Four Hundred and Forty-Three Cans of Frozen Egg Product v. United States, 226 U.S. 172, 183, 33 S.Ct. 50, 53, 57 L.Ed. 174 (1912) ("We do not think it was intended to liken the proceedings to those in admiralty beyond the seizure of the property by process in rem, then giving the case the character of a law action") ; United States v. 216 Bottles * * * Sudden Change, 36 F.R.D. 695, 698 (E. D.N.Y.1965) (question as to permissible scope of interrogatories in the instant case; court refused to limit inquiry to article seized pointing out that "[t]his proceeding is not an in rem action in the traditional and admiralty sense of the phrase, after the initial seizure").

■ To hold that the presence of the res is a jurisdictional necessity would be to disregard the principle that "[t]he character of the remedy sought should be determinative" in delineating the boundary between transitory and in rem actions. 1 Moore, Federal Practice ¶ 0.-142[2-1]. For all practical purposes, both parties having appeared, this is an action for a declaratory judgment to define Sudden Change as a drug. Although a judgment of condemnation purports to affect only the article actually seized, the findings in a seizure case—as in the usual civil action—have been said to be res judicata in a later injunction action brought against the same claimant. United States v. Nysco Laboratories, Inc., 318 F.2d 817 (2d Cir. 1963).

■ Resort to admiralty and *in rem* fictions serves only to obscure substantive policies of statutes the courts are called upon to interpret. Since adoption of the Federal Rules of Civil Procedure thirty years ago, a major theme in American practice has been the elimination of procedural distinctions based upon the nature of a cause of action. Particularly in view of the 1966 integration of admiralty and civil rules, procedure in admiralty and other in rem cases should be the same as in cases in law and equity unless a strong policy or statute prevents this uniformity of treatment. Cf. Ira S. Bushey & Sons, Inc. v. United States, 398 F.2d 167 (2d Cir. 1968) (right to interlocutory appeal depends upon statutory characterization of proceeding as one in admiralty).

■ We hold that we have jurisdiction of this action. The fact that the seized goods have never been in New York is not significant in this case.

## STATUTORY DEFINITIONS

Subchapter V of the Federal Food, Drug and Cosmetic Act deals with drugs. Subchapter VI governs cosmetics.

Drugs are defined as:

"(1) articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (2) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (3) articles (other than food) *intended to affect the structure* of any function *of the body of man* or other animals; and (4) articles intended for use as a component of any article specified in clause (1), (2), or (3) of this paragraph; but does not include devices or their components, parts, or accessories." 21 U.S.C. § 321(g) (1). (Emphasis supplied.)

Cosmetics are defined as:

"(1) articles, intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise *applied to the human body* or any part thereof *for* cleansing, beautifying, promoting attractiveness, or *altering the appearance*, and (2) articles intended for use as a component of any such articles; except that such term shall not include soap." 21 U.S.C. § 321(i). (Emphasis supplied.)

█ The fact that an article is a cosmetic does not preclude its being a drug. See S.Rep. No. 361, 74th Cong., 1st Sess., reprinted in Dunn, Federal Food, Drug and Cosmetic Act 239–40 (1938) (definition of drug and cosmetic not mutually exclusive). In 1962, Congress "to avoid any possible confusion" (H.Rep. No. 2164, 87th Cong., 2d Sess. at 13 (1962)), added a new section 359 to the sub-chapter on Drugs and Devices which provides that "[t]his sub-chapter * * * shall not apply to any cosmetic unless such cosmetic is also a drug or device or component thereof."

The crucial question presented by this case is whether Sudden Change is a product falling within both the drug and cosmetic definitions. The answer to this question is dispositive of the case since, if a product is not a "drug" it is not a "misbranded" or "new" drug under the Federal Food, Drug, and Cosmetic Act.

The phrase in the definition of drug relied upon by the government is "intended to affect the structure * * * of the body of man * * *." 21 U.S.C. § 321(g) (1). It contends either that Sudden Change does "affect the structure of" the face or skin or that the seller makes this claim.

As chief authority for its position, the government cites the recent case of United States v. An Article Consisting of 36 Boxes —— —— —— Line Away, Temporary Wrinkle Smoother, Coty, 284 F. Supp. 107 (D.Del.1968). This case involved a competing wrinkle remover with the same active ingredient as Sudden

Change. The court held for the government, stating: "Obviously, by intending to smooth, firm and tighten the skin, Line Away has as its objective affecting the structure of the skin. Hence, it falls within the literal definition of a drug. * * *" Id. at p. 109.

## DOES SUDDEN CHANGE AFFECT THE STRUCTURE OF THE SKIN?

█ (a) *Physical Effect*

The only evidence before us indicates that there is no effect on the skin cells except a temporary tightening of the surface. The Committee on Cutaneous Health and Cosmetics of the American Medical Association on the basis of reports, clinical evaluations and personal observation, found that:

"bovine serum albumin products apparently have no biochemical or physiological activity when applied to the skin and their application results only in temporary physical surface changes. The pertinent results indicate that the effect on the skin produced by these products can be (a) totally eliminated if the skin is washed with soap and water, (b) reduced significantly by vigorous use of the facial muscles of expression, (c) simulated by using test materials which produce contracting films when applied to the skin, (d) shown not to promote or retard the transportation of water through the horny layer of the skin (as demonstrated on isolated sheets of stratum corneum), and (e) correlated to no demonstrable changes in the histology of the skin."

On the basis of this finding, as well as the affidavits and other evidence before us, we conclude that Sudden Change does not affect the structure of the body.

(b) *Claimed Effect*

█ Whether a product actually affects the structure of the body does not dispose of the issue since a claim that it will have such an effect suffices to place it within the statutory drug definition.

See, e. g., United States v. 354 Bulk Cartons * * * Trim Reducing Aid Cigarettes, 178 F.Supp. 847 (D.N.J.1959) (article drug because of claims made for it even though it had no effect); United States v. 250 Jars * * * Cal's Tupelo Blossom U.S. Fancy Pure Honey, 344 F. 2d 288, 289 (6th Cir. 1965) (honey claimed to be "a panacea for various diseases and ailments"). The intended use of a product may be determined by reference to any relevant source. See, e. g., United States v. Hohensee, 243 F.2d 367, 370 (3d Cir.), cert. denied, 353 U.S. 976, 77 S.Ct. 1058, 1 L.Ed.2d 1136 (1957) (pamphlets and oral representations at lectures); United States v. Millpax, Inc., 313 F.2d 152, 154 (7th Cir.), cert. denied, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 198 (1963) (magazine articles).

The box in which Sudden Change was sold and the accompanying package insert bear the following statements:

"The Perfected Anti-Wrinkle Face Lift.

Face Lift Without Surgery.

By simple dynamic contraction, it lifts, firms, tones slack skin * * * smoothes out wrinkles, lifts puffs under eyes. * * *

It acts noticeably, visibly—and so quickly you will *see* and *feel* results minutes after you apply it.

That tingling sensation you will feel, tells you that SUDDEN CHANGE is beginning to work.

During this time, the firming sensation may seem to disappear ——— —— but the moisturizing effect of Sudden Change will continue to act: bringing you a new smoothness that will last for hours.

Acts in Minutes.

Lasts for Hours.

Wears off Gradually.

Not a hormone or chemical astringent, Sudden Change is a concentrated purified natural protein."

The government claims that these statements demonstrate that the product is intended to affect the structure of the body. The difficulty with the government's position is that, contrary to Congress' express intention, this reasoning would convert all cosmetics—as well as other items—into drugs. If lifting and firming products are deemed intended to affect the structure of the body, girdles and brassieres would be "devices" within the meaning of the Act. 21 U.S.C. § 321(h). If smoothing and moisturizing claims bring a product within the definition of a drug, it is difficult to see how any make-up products could escape. Even detergents which promise to "soften your hands while you do dishes" would appear to be included within the government's expansive reading. So too, would men's after shave astringents.

The government contends that in addition to these promises of moisturizing, softening, tightening and smoothing, a woman using Sudden Change would expect "her face [to] take on beneficial changes otherwise available only through the expensive and painful procedure of surgical face lift," and that this claim of "face lift without surgery" demonstrates that the product is intended to affect the structure of the body.

Such seller's claims must be considered in the special context of late twentieth century American mores. The labeling of Sudden Change is directed to women who are potential consumers. Subjected to the incessant advertising campaigns of the cosmetic industry, a potential buyer can be expected to have achieved some immunity to the beautifiers' hyperbole.

The cosmetic industry sells over two billion dollars worth of its products annually by extravagant assurances that users will be even more alluring than they naturally are. A substantial portion of the sales dollar is spent on advertising. One cosmetic firm alone spends five million dollars a year in advertising. New York Times, July 25, 1968, p. 52, col. 4.

The difficulties posed by widespread competitive advertising have been recognized by the Chief of the Division of Food and Drug Advertising of the Federal Trade Commission. This agency

enforces a statute containing definitions of "drug" and "cosmetic" identical to those found in the Federal Food, Drug, and Cosmetic Act. Noting that no one expects claims for cosmetics to be taken literally, he declared:

"[T]he Commission's authority and procedures with respect to advertising for cosmetics are precisely the same as for foods, drugs and devices. However, we encounter one factor more commonly in the cosmetic field than in the others. This is advertising with the glamour theme, where it is difficult to distinguish between legitimate puffery—glorified sales talk which no one believes literally—and substantive representations which are believed and relied upon. Certainly, for example, no cosmetic could long exist without promising increased beauty. We are not likely to challenge the claim." Sweeny, Some Considerations in Evaluating Advertising for Cosmetics, 19 Food Drug Cosmetic L.J. 53, 57 (1964).

The vulnerability of consumers attempting to distinguish between "puffery" and "substantive representations which are believed and relied upon" is clearly spelled out in the following excerpt from an article appearing in the Consumer's Union entitled "Cosmetics Versus the Consumer":

"The world of cosmetics advertising is a strange one. A girl can spend her holiday on the deck of a sailboat beating into a 10-knot breeze, one would judge by the slant of the deck, without disturbing a hair of her well-sprayed head. * * *

All of these exaggerations are embellishments attributed for promotional purposes to products of basically limited usefulness. Commonsense says the products cannot possibly do all that is claimed for them. * * * .

Considering the limited range of physical effects that cosmetics can have, one may argue that the purposes of cosmetics are mainly psychological; that if the buyer is convinced she is benefited by using the product, full value is received. [There is] no ready answer to the ethical questions posed by the general acceptance of gross deception in cosmetics promotion." Aaron, Cosmetics Versus the Consumer, Consumers Union, Feb. 1963, reprinted 109 Cong.Rec. 1244–45 (daily ed. Jan. 28, 1963) at the request of Congresswoman Sullivan who was introducing H.R. 1235 [see discussion of Congressional bills, infra].

The problem of acceptable advertising limits is particularly acute with respect to the human skin—the largest visible organ of the human body. As the following testimony before a Congressional Committee indicates, the skin is subject to minor aesthetic defects that vendors of cosmetics magnify and cater to:

"In the view of modern cosmetology, the normal skin is never quite perfect. We are subject to a constant stream of suggestion through the press, radio and television that it is too dry; it is too oily; it is coarse; it smells offensively; it develops too many pimples; it may give rise to a cancer any minute; it is covered with fungi; it crawls with germs; it has adolescent pimples; it is wrinkled and old; it makes one undesirable to one's boy friend or mistress, or husband, or wife, or employer; it sunburns too rapidly; it tans too slowly * * * the skin needs vitamins; it needs minerals. Under such a stream of suggestions it is not surprising that neuroses develop and flourish, and that the human skin is subjected to a multiplicity of drying, oiling, massaging * * * and general beautification and protection procedures which are utterly staggering to contemplate." Statement of Donald M. Pillsbury, M.D., Hearings, House Select Comm. to Investigate the Use of Chemicals in Foods and Cosmetics, 81st Cong., 2d Sess., pt. 3, at 1107–1108 (1952).

Against this background of constant exposure to puffing and extravagant claims, we cannot believe that a prospective purchaser of Sudden Change—faced with instructions advising her that she

can repeat the process in a few hours—expects anything other than a possibility that she may look better. She would view the promise of "face lift" with the same skepticism—or lack of it—as she would view other promises offering her beauty, loveliness, rejuvenation or a young look. She would not expect a structural change of the kind available through plastic surgery.

If the mere altering of the appearance of the skin is to be equated with affecting the structure of the body, powders, lipsticks, night creams, day creams, make-up bases and numerous other products would be swept into the drug definition. It is difficult to imagine how—other than by a new hairdo—one can alter one's appearance without in some way affecting the skin. Yet "altering the appearance" is part of the definition of cosmetic in 21 U.S.C. § 321(i). Such a definition would be unnecessary if all articles "altering the appearance" were drugs.

Federal Trade Commission v. Liggett and Myers Tobacco Co., 108 F.Supp. 573 (S.D.N.Y.1952), aff'd mem., 203 F.2d 955 (2d Cir. 1953), suggests that such expansive readings will not be permitted absent some statutory support. In that case the Federal Trade Commission sought to enjoin allegedly false advertising for cigarettes on the basis of its power to enjoin false advertising likely to induce the purchase of "drugs"—defined in a way identical to that in the Federal Food, Drug, and Cosmetic Act. The court in refusing to hold that cigarettes affect the structure of the body wrote:

> "Surely, the legislators did not mean to be as all-inclusive as a literal interpretation of this clause would compel us to be. * * * As times and conditions change it is fitting that an administrative agency, before resorting to the legislature, should seek to invoke new means of coping with still unsolved problems. But in its zeal the agency must not exceed the bounds of its statute." 108 F.Supp. at 576, 577.

## LEGISLATIVE HISTORY

■ Our view of the scope of the "drug" definition is supported by the legislative history and Congressional understanding of the Act.

Although some of the bills introduced in Congress prior to 1906 included cosmetics in the definition of a drug (Statement by Walter G. Campbell, Chief, Food and Drug Administration, Hearings on S.1944 Before the Senate Committee on Commerce, 73rd Cong., 2d Sess., at 16 (1934)), there was no mention of cosmetics in the first Federal Food and Drug Act enacted in that year. Except in those instances where the labeling made medicinal claims, cosmetics were not covered by the definition of "drug." Other than items listed in the United States Pharmacopoeia or National Formulary, the term "drug" included only "any substance or mixture of substances intended to be used for the cure, mitigation or prevention of disease of either man or other animals." 1 Dunn's Food and Drug Laws 2 (1927–28).

When the 1906 Act was comprehensively revised in 1938, the revisors rejected an approach that would have included all cosmetics as drugs in favor of adding a definition of "cosmetic" and expanding the definition of "drug" to its present form. Congress did not follow suggestions such as the 1913 recommendation of the Secretary of Agriculture "that the definition of * * * 'drug' be made to include all cosmetics, toilet preparations, face creams, hair dyes, obesity and anti-lean remedies, and medical devices for the treatment or prevention of disease." Except for noting that "[d]eadly drugs intended for reducing purposes or otherwise to affect the structure or function of the body" would be covered under the expanded definition of drug (H. Rep. No. 2755, 74th Cong., 2d Sess., reprinted in Dunn, supra at 552), the legislative history of the 1938 Act is devoid of specific examples indicating the scope of the new "drug" definition as applied to cosmetics. Cf. Dunn, supra at 162 (Statement of Senator Copeland, sponsor of the pro-

posed Act: "narrow definition * * * permits the escape * * * of preparations intended to reduce excess weight"); Dunn, supra at 239 ("expansion of the definition of the term 'drug' is essential if the consumer is to be protected against * * * such preparations as 'slenderizers' "). There are, nevertheless, indications that Congress does not interpret the drug definition as covering a product such as Sudden Change.

In 1951, the House of Representatives authorized a committee under the chairmanship of Congressman Delaney to investigate the use of chemicals in cosmetics. H. Res. 447, 82nd Cong., 1st Sess. After public hearings in 1951 and 1952, this Committee issued a report. It quotes the Commissioner of the Food and Drug Administration as stating that: "We have been able to take positive regulatory action on harmful deodorants, hair straighteners, depilatories * * * [only] after people were injured." H. Rep. 2182, 82nd Cong., 2d Sess., at 3 (1952). It gives as examples, among others, of hair lacquers, fingernail lacquers, nail polish, lipstick, wave lotions and shampoos as products which caused injuries. Id. at pp. 4 and 5. It concludes that the public could be safeguarded against similar injuries in the future by "a pretesting requirement, similar to that presently existing with respect to new drugs." Id. at p. 10.

There is no suggestion that the Committee felt that the existing definition of "drug" could be applied to any of these kinds of products, thereby making new varieties subject to the pretesting requirements for new drugs.

Nor is there any indication that the Committee believed that advertising claims would allow the Federal Drug Administration to exercise jurisdiction under the "drug" definition. Members of the Committee apparently thought that this was a matter for the Federal Trade Commission, as the following excerpt from the hearings indicates:

"Mr. McDonough [member of the Committee]: * * * Now, I don't know of any commodity outside of, perhaps, the automobile industry, that appeals so much to the public as the cosmetic industry, as to what a cream will do. * * * Do you think that the reliable cosmetic people, long-established, that make these claims about what a cream, a nail polish, a hair remover or cold wave or hot wave, or whatever they are, are over-claiming the benefits of their material?

\* \* \* \* \* \*

What I am getting at is * * * do you think we ought to recommend to the Federal Trade Commission something in the way of control of claims on the part of cosmetics that cannot be proven?

Mr. Kleinfeld [chief counsel to the Committee]: If I may interrupt —under the present Federal Trade Commission Act, the Federal Trade Commission has that power right now.

\* \* \*

Mr. Horan [member of the Committee]: * * *. [D]o you not feel that is one of the by-products of our hearings? If it is proper and if it will serve society best, one of the by-products of our hearings will be to direct the Federal Trade Commission to act in cases where it should be and where it perhaps has not been acting. Mr. Kleinfeld: I agree." Hearings, House Select Comm. to Investigate the Use of Chemicals in Foods and Cosmetics, 82nd Cong., 1st Sess., pt. II, pages 753–54 (1951).

In 1953, Congressman Delaney introduced a bill, H.R. 2244 (99 Cong.Rec. 663), that would have required pretesting of new cosmetics. No action was taken on it. In subsequent years, bills requiring pretesting of new cosmetics have been introduced in each Congress. (See, e. g., 84th Congress: H.R. 4476 (101 Cong.Rec. 2255); 85th Congress: H.R. 4015 (103 Cong.Rec. 1224), H.R. 9153 (103 Cong.Rec. 13805), H.R. 4431 (103 Cong.Rec. 1574); 86th Congress: H.R. 1360 (105 Cong.Rec. 57), H.R.

5661 (105 Cong.Rec. 4181); 87th Congress: H.R. 11582 (108 Cong.Rec. 7753), H.R. 1235 (107 Cong.Rec. 61); 88th Congress: H.R. 6788 (109 Cong. Rec. 10175), H.R. 1235 (109 Cong.Rec. 56), H.R. 5777 (109 Cong.Rec. 6865), H.R. 8418 (109 Cong.Rec. 16932); 89th Congress: H.R. 1235 (111 Cong.Rec. 89); 90th Congress: H.R. 1235 (113 Cong.Rec. H 174), H.R. 4486 (113 Cong.Rec. H 911).

In 1962, Congresswoman Sullivan, herself the sponsor of a cosmetic testing bill, testified in behalf of H.R. 11582, the administration's drug amendment bill, which contained a provision requiring pretesting of new cosmetics. She stated:

> "Cosmetics are as old as history, and the basic ingredients used are well known in the trade. So sales spurts must often depend upon mysterious 'gimmick' additives—turtle oil to promote skin rejuvenation or tighten chin muscles (but did you ever see a turtle's skin?); shark oil; queen bee royal jelly; chick embryo extract; horse blood serum; pigskin extracts —yes, these are all ingredients which have been introduced in face and skin creams to form the basis for extravagant claims of beauty in a jar.

> They are seldom dangerous—but if they are, we never know about it * * * the 1938 act does not even require cosmetic manufacturers to identify ingredients in their products." Hearings on H.R. 11581 and H.R. 11582 Before the House Committee on Interstate and Foreign Commerce, 87th Cong., 2d Sess. 96 (1962).

Congresswoman Sullivan, one of the principal advocates of cosmetic pretesting, apparently did not consider the possibility that these products could be classified as "drugs" and would then be "misbranded drugs" if their label did not bear "the common or usual name of each active ingredient." 21 U.S.C. § 352(e) (amended since Congresswoman Sullivan's statement to require "the established name and quantity of each active ingredient").

It would seem from these bills and comments that Congress has not accepted the interpretation of "drug" urged by the government. Cf. Presidential Message, 111 Cong.Rec. 411, daily ed. Jan. 7, 1965 (recommending legislation to require premarketing examination of cosmetics).

▪ The primary concern of the Federal Food, Drug, and Cosmetic Act is to safeguard health. While a secondary purpose of the Act has been the protection of the economic interests of the consumer, the producer's right to market his product free of excessive governmental regulation was also considered by Congress in enacting this protective legislation.

When a question of health is involved, the courts have not hesitated to construe the Act liberally so as to give the utmost protection to the public. For example, in United States v. Dotterweich, 320 U. S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943), the Supreme Court upheld the conviction of the president of a corporation which had purchased and shipped adulterated and misbranded drugs without any proof or claim that the defendant knew of, or participated in, the transaction. The court explained that it refused to adopt a restrictive view despite the penal nature of the Act because:

> "the purposes of this legislation * * * touch[es] phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words. * * * Such legislation * * * [i]n the interest of the larger good * * * puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger." 320 U.S. at 280–281, 64 S.Ct. at 136.

See also United States v. Sullivan, 332 U.S. 689, 696, 68 S.Ct. 331, 335, 92 L.Ed. 297 (1948) ("the Act as a whole was designed primarily to protect consumers from dangerous products"); cf. AMP Incorporated v. Gardner, 389 F.2d 825, 830 (2d Cir. 1968) ("We would * * * be reluctant to give a narrow construction to this statute, touching the public health as it does"; product used for ligating blood vessels during surgery).

There is no allegation that Sudden Change poses any danger to its users. The affidavits of the government's experts—only one of whom had ever tested bovine albumin—make no such suggestion. The claimant has submitted a statement from the Committee on Cutaneous Health and Cosmetics of the American Medical Association which concludes "that bovine serum albumin products are safe for use on the human skin and cause temporary physical surface changes." Since the product is not intended to deal with a disease there is no need to fear that a user of Sudden Change will be lulled into a false and dangerous sense of medical security.

▆ Arguably the government might have proceeded by a criminal prosecution on the theory it espouses in this seizure action. See 21 U.S.C. §§ 331(a), (d), 335, 352, 333; United States v. Detroit Vital Foods, Inc., (6th Cir. 1968) (seizure and criminal prosecutions simultaneously); cf. Boyd v. United States, 116 U.S. 616, 634, 6 S.Ct. 524, 29 L.Ed. 746 (1886) (seizure action "quasi-criminal" in nature). A balancing of the purely economic interest of the consumer against the economic interest of the producer discloses no reason to depart from the ordinary canon of interpretation which requires a criminal statute to be construed narrowly so that it does "not * * * extend to cases not covered by the words used." United States v. Resnick, 299 U.S. 207, 209, 57 S.Ct. 126, 127, 81 L.Ed. 127 (1936).

Claimant's motion for summary judgment is granted.