**UNITED STATES of America,**
**Appellant,**

v.

**An ARTICLE . . . CONSISTING OF 216 individually CARTONED BOTTLES, MORE OR LESS, of an Article Labeled in part: SUDDEN CHANGE, etc., Hazel Bishop, Inc., Appellee.**

**No. 367, Docket 32847.**

United States Court of Appeals
Second Circuit.

Argued Feb. 11, 1969.

Decided April 8, 1969.

Carl Golden, Special Asst. U. S. Atty. (Joseph P. Hoey, U. S. Atty., Eastern District of New York, on the brief), for appellant.

Andrew J. Graham, New York City (Graham, McGuire & Campaign, William L. McGuire, and Joseph J. Bosco, New York City, on the brief), for appellee.

Vincent A. Kleinfeld, Alan H. Kaplan, Stanley J. Krieger, Kleinfeld & Kaplan, Washington, D. C., Fuller Holloway Hamel, Morgan, Park & Saunders, Washington, D. C., on the brief of the Toilet Goods Association, Inc., as amicus curiae.

Before ANDERSON and FEINBERG, Circuit Judges, and MANSFIELD, District Judge.*

* Of the Southern District of New York, sitting by designation.

ANDERSON, Circuit Judge:

This is an appeal in a seizure action from an order of the United States District Court for the Eastern District of New York entered on July 30, 1968, denying the Government's motion for summary judgment and granting summary judgment for the claimant. The seizure concerned 216 bottles of a cosmetic product called "Sudden Change" which is a clear liquid lotion consisting primarily of two ingredients: bovine albumen (15%) and distilled water (over 84%). It is meant to be applied externally to the surface of the facial skin, and it is claimed, *inter alia*, in its labeling and advertising that it will provide a "Face Lift Without Surgery." The court below[1] described the effects of the product as follows:

> Allowed to dry on the skin, it leaves a film which (1) masks imperfections, making the skin look smoother and (2) acts mechanically to smooth and firm the skin by tightening the surface. Both effects are temporary. There is apparently no absorption by, or changes in, skin tissue resulting from its applications; it washes off.

The central issue presented in this appeal is whether Sudden Change is, within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 (g) (1), a "drug." That Section, in pertinent part, provides: "The term 'drug' means * * * (C) articles (other than food) intended to affect the structure * * * of the body of man * * *." The question posed is whether, by reason of its labeling and promotional claims, Sudden Change is to be deemed a drug for purposes of the Act.

The civil *in rem* action was instituted by the United States in the United States District Court for the Southern District of Florida, pursuant to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, et seq. The Libel of Information was filed by the Government on May 8, 1964, seeking seizure and condemnation of 216 bottles in individual cartons, allegedly misbranded, labeled in part "Sudden Change by Lanolin Plus." The Libel alleges that the article seized is a "drug" within the meaning of 21 U.S.C. § 321 (g) (3) [subsequently redesignated as § 321(g) (1) (C), 52 Stat. 1040 (1965)] and a "new drug" within the meaning of 21 U.S.C. § 321(p), which had been shipped in interstate commerce without an approved New Drug Application filed pursuant to 21 U.S.C. § 355(b), effective with respect to such drug, in violation of 21 U.S.C. § 355(a). The Libel further alleges that the article was misbranded when introduced into and while in interstate commerce within the meaning of 21 U.S.C. § 352(a), in that the labeling for the article contains false and misleading statements with respect to the effectiveness of the drug for eliminating facial wrinkles and giving a face lift without surgery; and within the meaning of 21 U.S.C. § 352(e) (1) (A) (ii), in that the article is fabricated from two or more ingredients and that the label fails to bear the established name of each active ingredient.

Pursuant to monition issued by the District Court, the United States Marshal for the Southern District of Florida seized the article and labeling material accompanying it. Following the seizure, Hazel Bishop, Inc., now known as Bishop Industries, Inc., intervened, filed a claim to the article and answered the Libel. Claimant's answer admits that the article and its accompanying label were shipped in interstate commerce; that the article was seized within the jurisdiction of the United States District Court for the Southern District of Florida; and that the article has a "temporary cosmetic effect on wrinkles." All other allegations in the Libel are denied. On September 2, 1964, the action was removed on claimant's motion to the United

1. United States v. An Article * * * Consisting of 216 individually Cartoned Bottles, More or Less, of an Article Labeled in part: Sudden Change, etc., Hazel Bishop, Inc., now known as Bishop Industries, Inc., Claimant, 288 F.Supp. 29, 30 (1968).

States District Court for the Eastern District of New York.

Following discovery proceedings, the Government moved for summary judgment contending, *inter alia*, that the claims appearing in the article's labeling constituted it a drug under the law and that the product was misbranded as a matter of law since its label failed to bear the established name of each of its active ingredients. To support its motion, the Government relied on claimant's admissions in answers to interrogatories, the deposition of claimant's medical expert, and the affidavits of government experts.

Claimant interposed affidavits in opposition to the Government's motion and in support of its cross-motion for summary judgment, in which it contends that the article is solely a cosmetic which functions simply as a mask for facial lines and wrinkles and that the product's labeling claims were not understood otherwise by cosmetic consumers. It argues that the Government's construction of 21 U.S.C. § 321(g) (1) (C) is so broad that every "cosmetic" would automatically be a "drug," since by definition a cosmetic must have some "effect" on the human body, even though that effect is only a change of appearance. In support of claimant's cross-motions and in opposition to the Government's motion, affidavits of claimant's vice-president, a cosmetologist and a medical expert were submitted.

Claimant also filed a statement of claimed uncontested facts pursuant to Rule 9(g) of the General Rules of the United States District Court for the Eastern District of New York, which admits, *inter alia*:

1. That the label for Sudden Change does not specify its ingredients.

2. That the specific ingredients for the article are Bovine Serum, Albumin 15.00%, Sodium Benzoate 0.70%, Ethylmercurithiosalicylate 0.005%, 6 Acetoxy–2, 4 dimethyl–N–diozaul 0.05% and distilled water to make 100.00%.

3. That the article's labeling made the following claims:

(a) "it gives a face lift without surgery"

(b) "it lifts the skin"

(c) "it firms the skin"

(d) "it tones the skin"

(e) "it smoothes the skin"

(f) "it moisturizes the skin"

(g) "it provides a tingling sensation to indicate the article is working"

(h) "it lifts puffs under the eyes"

(i) "it provides the user with beneficial results for hours"

(j) "it is more effective if applied regularly"

4. Claimant further admits that its labeling claims achieved the foregoing results by the following mechanisms of action:

"When 'Sudden Change' dries on the surface of the skin, the residual solids are deposited as a film. This effect is achieved by the cohesive properties of this substance which cause the particles to be attracted to each other. The film on the surface of the skin thus achieves a dynamic multilateral tensing action and as said deposit ultimately undergoes an isometric process, it smoothes the surface of the skin by a virtually invisible masking effect and imparts to the facial tissues a lift, firmness and tone which smooth out the skin surface. In so doing, the preparation does not enter into the tissues of the skin or bring about any change in the skin's cellular structure or function."

\* \* \* \* \* \*

"As the aqueous portion of 'Sudden Change' evaporates after application and the contractile film is formed, the evaporative and contractile processes result in a tactile sensation of tightening that is perceptible to the user. As the film is formed and lines are, in fact, smoothed out, a visible difference is apparent to the user."

5. Claimant concedes that there is no approved New Drug Application in effect for the article "Sudden Change."

A statement by the Committee on Cutaneous Health and Cosmetics of the American Medical Association, which was an exhibit annexed to claimant's Answers to Interrogatories, stated, *inter alia*:

"In the absence of an excessive amount of pharmacologically active preservative agents, the bovine serum albumin products apparently have no biochemical or physiological activity when applied to the skin and their application results only in temporary physical surface changes. The pertinent results indicate that the effect on the skin produced by these products can be (a) totally eliminated if the skin is washed with soap and water, (b) reduced significantly by vigorous use of the facial muscles of expression, (c) simulated by using test materials which produce contracting films when applied to the skin, (d) shown not to promote or retard the transportation of water through the horny layer of the skin (as demonstrated on isolated sheets of stratum corneum), and (e) correlated to no demonstrable changes in the histology of the skin.

The Committee on Cutaneous Health and Cosmetics therefore concludes that bovine serum albumin products are safe for use on human skin and cause temporary physical surface changes."

The box in which Sudden Change is sold bears the capitalized words "SUDDEN CHANGE" * * * "THE PERFECTED ANTI-WRINKLE FACE LIFT." Another side of the box bears the following description:

"SUDDEN CHANGE by Lanolin Plus is the new and improved, dramatically different wrinkle-smoothing cosmetic. By simple, dynamic contraction, it lifts, firms, tones slack skin * * * smooths out wrinkles, lifts the puffs under eyes, leaving your contours looking beautifully defined. It acts noticeably, visibly * * * and so quickly you will see and feel results minutes after you apply it. Not a hormone or chemical astringent, SUDDEN CHANGE is a concentrated purified natural protein, a clear invisible liquid cosmetic that can be used as often as you like.

Because there never has been a cosmetic exactly like SUDDEN CHANGE before, we suggest you read the directions carefully before applying. For best results, use SUDDEN CHANGE often. The more you use, the longer your wrinkle-free look will last."

The face of the leaflet insert bears the following words, capitalized and displayed prominently: "FACE LIFT WITHOUT SURGERY"—"The Perfected Anti-Wrinkle Face Lift Acts in Minutes Lasts for Hours." It also repeats the descriptive material that appears on the box and contains directions for use.

The advertising claims for Sudden Change (newspaper, magazine, store placard, television) include the prominently displayed capitalized words "Now * * a face lift without surgery!" together with "before" and "after" poses of a model and the following words:

" 'Sudden Change'—the new anti-wrinkle face lift—works in minutes * * * lasts for hours * * * gives you a noticeably smoother younger look.

Sudden change is the one cosmetic that can make you look years younger for hours * * * although it cannot eliminate wrinkles permanently. Just smooth it on and watch it smooth away crowsfeet, laugh and frown lines—even under-eye puffiness. In minutes. Sudden Change helps keep fatigue lines, wrinkles and 'that tired look' away for hours. Sudden Change is pure natural protein—contains no hormones—does not change the structure or function of your skin in any way. Try Sudden Change. As long as you are using Sudden Change, you have nothing to lose but your wrinkles. 'Sudden Change' by Lanolin Plus $2.95 plus tax."

As stated *supra*, the applicable section of the Federal Food, Drug and Cosmetic Act, § 321(g) (1) (C), defines "drug"

for purposes of the Act in pertinent part as follows:

"(g) (1) The term 'drug' means * * (C) articles (other than food) intended to affect the structure * * * of the body of man * * *."

■ It is clear that the fact that an article is a cosmetic does not preclude its being a drug for purposes of the Act. See S.Rep. No. 361, 74th Cong., 1st Sess. reprinted in Dunn, The Federal Food, Drug and Cosmetic Act 239–240 (1938).

■■ It is well settled that the intended use of a product may be determined from its label, accompanying labeling, promotional material, advertising and any other relevant source. United States v. Hohensee, 243 F.2d 367, 370 (3 Cir. 1957), cert. den., 353 U.S. 976, 77 S.Ct. 1058, 1 L.Ed.2d 1136 (1957) (intended use proved by promotional claims in graphic material as well as oral representations); United States v. Millpax, Inc., 313 F.2d 152, 154 (7 Cir. 1963), cert. den., 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 198 (1963) (intended use proved by form "disclaimer letter" and magazine testimonials implying that iron tonic was a cancer cure); Nature Food Centres, Inc. v. United States, 310 F.2d 67, 69 (1 Cir. 1962), cert. den., 371 U.S. 968, 83 S.Ct. 552, 9 L.Ed.2d 539 (1963) (intended use proved by claims made in lectures and "Class Notes on Health and Nutrition"); United States v. Articles of Drug * * * Foods Plus, Inc., 362 F.2d 923, 926 (3 Cir. 1966) (intended use proved by broadcast claims). Regardless of the actual physical effect of a product,[2] it will be deemed a drug for purposes of the Act where the labeling and promotional claims show intended uses that bring it within the drug definition. See, e. g., *Hohensee, supra* (ordinary food products, such as peppermint tea leaves, within the statutory drug definition because of claims); United States v. 354 Bulk Cartons * * * Trim Reducing-Aid Cigarettes, 178 F.Supp. 847, 851 (D.N.J.1959) (cigarettes held to be a drug where they were claimed to be effective in reducing weight); United States v. 46 Cartons * * * Fairfax Cigarettes, 113 F.Supp. 336, 337–338 (D.N.J.1953) (cigarettes claimed to be effective in preventing respiratory and other diseases held to be a drug); United States v. 250 Jars * * * "Cal's Tupelo Blossom U. S. Fancy Pure Honey", 344 F.2d 288, 289 (6 Cir. 1965) (honey held to be a drug because of claims that it was "a panacea for various diseases and ailments"); Bradley v. United States, 264 F. 79, 82 (5 Cir. 1920) (mineral water a drug where claims "that it possesses certain elements or ingredients which are curative, or at least alleviative, for the diseases named in the label"); United States v. 3 Cartons * * * "No. 26 Formula GM etc.," 132 F.Supp. 569, 573–574 (S.D.Cal.1952) [therapeutic claims for animal heart held to bring it within the definition of drug in 21 U.S. C. § 321(g) (2)].[3] Thus, Congress has made a judgment that a product is subject to regulation as a drug if certain promotional claims are made for it.

---

2. The District Court specifically held that "Sudden Change does not affect the structure of the body." *Id.* In view of our disposition of the question presented by this appeal, we find it unnecessary to reach the issue of actual physical effect.

3. The legislative history provides firm support for this rule. See S.Rep.361, 74 Cong., 1st Sess. (Dunn p. 240):

The use to which the product is put will determine the category into which it will fall. If it is to be used only as a food it will come within the definition of food and none other. If it contains nutritive ingredients but is sold for drug use only, as clearly shown by the labeling and advertising, it will come within the definition of drug, but not that of food. If it is sold to be used both as a food and for the prevention or treatment of disease, it would satisfy both definitions and be subject to the substantive requirements for both. The manufacturer of the article, through his representations in connection with its sale, can determine the use to which the article is to be put. For example, the manufacturer of a laxative which is a medicated candy or chewing gum can bring his product within the definition of drug and escape that of food by representing the article fairly and unequivocally to be a drug product."

The mere statement of this rule poses a crucial issue: by what standards are these claims to be evaluated? Or, to put it another way, what degree of sophistication or vulnerability is to be ascribed to the hypothetical potential consumer in order to understand how these claims are understood by the buying public? The District Court answered this question as follows:

"Such seller's claims [as that of "face lift without surgery"] must be considered in the special context of late twentieth century American mores. The labeling of Sudden Change is directed to women who are potential consumers of the article. Subjected to the incessant advertising campaigns of the cosmetic industry, a potential buyer can be expected to have achieved some immunity to the beautifiers' hyperbole." [4]

And further:

"Against this background of constant exposure to puffing and extravagant claims, we cannot believe that a prospective purchaser of Sudden Change —faced with instructions advising her that she can repeat the process in a few hours—expects anything other than a possibility that she may look better. She would view the promise of 'face lift' with the same skepticism— or lack of it—as she would view other promises offering her beauty, loveliness, rejuvenation or a young look. She would not expect a structural change of the kind available through plastic surgery." [5]

Although this analysis properly focuses on the relevant question by inquiring into the subjective understanding of potential consumers, it appears to us to hypothesize an unduly high level of sophistication and skepticism. A primary purpose of the Act is the protection of the ultimate consumer's economic interests. See Federal Security Administrator v. Quaker Oats Co., 318 U.S. 218, 230, 63 S.Ct. 589, 87 L.Ed. 724 (1943); United States v. Two Bags * * Poppy Seeds, 147 F.2d 123, 126–127 (6 Cir. 1945).[6] Considering the remedial purposes of the Act and particularly of the 1938 amendments, the Supreme Court declared:

"The purposes of this legislation thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words." [7]

Accepting this admonition, we conclude that the purposes of the Act will best be effected by postulating a consuming public which includes "the ignorant, the unthinking and the credulous * * *." Florence Mfg. Co. v. J. C. Dowd & Co., 178 F. 73, 75 (2 Cir. 1910).[8] See, United States v. 62 Packages * *

---

4. 288 F.Supp. at 34.

5. *Id.*, at 35–36.

6. The legislative history supports the view that both health and economic interests of the consumer were considered. Thus, S.Rep.No.361, 74 Cong., 1st Sess., indicates that Congress was concerned with "unscrupulous" persons "endangering the public health and defrauding the consumer" (Dunn 237). H.Rep. 2755, 74 Cong., 2d Sess., indicates that Congress was concerned with "abuses of the consumer's health and pocketbook * * *." (Dunn 552). Finally, Senator Copeland, a sponsor of the expansion of the definition of drug in the 1938 revision of the Act (see the discussion of legislative history by the court below, 288 F.Supp., at 36), stated that the former "narrow definition" "permits the escape of preparations which are intended to alter the structure or some function of the body, as for example, preparations intended to reduce excessive weight. There are *many worthless* and some dangerous devices and *preparations falling within these classifications*" (Dunn 162). (Emphasis added.)

7. *United States v. Dotterweich*, 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943).

8. *The court was discussing likelihood of confusion of trademarks in an action alleging infringement and unfair competi-*

Marmola, etc., 48 F.Supp. 878, 887 (W.D. Wis.1943), aff'd, 142 F.2d 107 (7 Cir. 1944), cert. den., sub nom. Raladam Co. v. United States, 323 U.S. 731, 65 S.Ct. 68, 89 L.Ed. 587 (1944). See also United States v. 250 Jars * * * "Cal's Tupelo Blossom U. S. Fancy Pure Honey", *supra,* 344 F.2d at 289, which held that " * * * the Act was passed to protect unwary customers in vital matters of health and, consequently, must be given a liberal construction to effectuate this high purpose, and [this court should] not open a loophole through which those who prey upon the weakness, gullibility, and superstition of human nature can escape the consequences of their actions."

While it is not altogether clear what standard the court below applied, the reasoning appears to assume something like a "reasonable woman" standard. Thus, the District Court assumes that the "constant exposure to puffing and extravagant claims" has induced "some immunity to the beautifiers' hyperbole" which is such that the court "cannot believe" that the potential consumer of Sudden Change "expects anything other than a possibility that she may look better." [9] We agree that certain claims which argu-

ably would bring the product within § 321 (g) (1) (C) have so drenched the potential consumer that even the "ignorant, the unthinking and the credulous" must be presumed able to discount their promises as typical of cosmetic advertising puffery. We cannot agree, however, with the conclusion that such immunity or skepticism somehow transfers to the promise to "lift out puffs" or give a "face lift without surgery." The references to "face lift" and "surgery" carry distinctly physiological connotations, suggesting, at least to the vulnerable consumer, that the product will "affect the structure * * * of the body * * * " in some way other than merely temporarily altering the appearance. We do not accept the concept that skepticism toward familiar claims necessarily entails skepticism toward unfamiliar claims; the theory of the legislation is that someone might take the claim literally.

In other words, with the exception of those claims which have become so associated with the familiar exaggerations of cosmetics advertising that virtually everyone can be presumed to be capable of discounting them as puffery,[10]

---

tion. This Circuit subsequently extended this protective view of the consuming public to cases arising under the Federal Trade Commission Act. In Charles of the Ritz Dist. Corp. v. Federal Trade Commission, 143 F.2d 676, 679 (2 Cir. 1944), Judge Clark, speaking for the court of which the other members of the panel were Judge Learned Hand and Judge Swan, wrote:

> "[The Federal Trade Commission Act] was not 'made for the protection of experts, but for the public—that vast multitude which includes the ignorant, the unthinking and the credulous,' Florence Mfg. Co. v. J. C. Dowd & Co., 2 Cir., 178 F. 73, 75; and the 'fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced.' * * * The important criterion is the net impression which the advertisement is likely to make upon the general populace."

We believe that the remedial purpose of the Federal Trade Commission Act is

sufficiently analogous to that of the Federal Food, Drug and Cosmetics Act to justify the application of Judge Clark's reasoning to the case at bar.

9. 288 F.Supp., at 34–36.

10. This exception provides an answer to the principal contention of claimant and of the Toilet Goods Association as *amicus curiae,* an argument which was most persuasive in the court below, as the following passage indicates:

> "The difficulty with the government's position is that, contrary to Congress' express intention, this reasoning would convert all cosmetics—as well as other items—into drugs." 288 F.Supp., at 34.

We agree that the legislative history and the language of the Act require rejection of any rule which would convert all cosmetics into drugs. We believe, however, that the test which we have applied draws the necessary line while at the same time protecting the public. For example, promises that a product will "soften" or "moisturize" a woman's skin are so thor-

the question of whether a product is "intended to affect the structure * * * of the body of man * * *" is to be answered by considering, first, how the claim might be understood by the "ignorant, unthinking or credulous" consumer, and second, whether the claim as so understood may fairly be said to constitute a representation that the product will affect the structure of the body in some medical—or drug-type fashion, i. e., in some way other than merely "altering the appearance." [11]

■ We hold, therefore, that so long as Sudden Change is claimed to give a "face lift without surgery" and to "lift out puffs" it is to be deemed a drug within the meaning of 21 U.S.C. § 321(g) (1) (C). It should be understood, however, that if the claimant ceases to employ these promotional claims and avoids any others which may fairly be interpreted as claiming to affect the structure of the skin in some physiological, though temporary, way, then, assuming *arguendo* that no actual physical effect exists, the product will not be deemed a drug for purposes of the Act. While there may be merit in the cause of those who seek to require pretesting of new cosmetics, it is not for the courts to legislate such a requirement; rather it must rest in the hands of Congress to decide whether such an amendment to the statute should be enacted or not.

Reversed and remanded for proceedings not inconsistent with this opinion.

MANSFIELD, District Judge (dissenting) :

The Court today holds that a cosmetic which is not in fact a "drug" must nevertheless be classified as such because of the vendor's use in its labelling and advertising of two phrases deemed to carry "physiological connotations." I find myself unable to go along with this view.

"Sudden Change" recognizes that wrinkles are but the irreparable footprints of time, and that they may be temporarily softened or masked, but not obliterated. The product does not enter the tissue, cells, or molecular structure of the skin, or work any physiological changes in the body. It merely alters the appearance of the face for a few hours by smoothing or toning the skin. Unless it is repeatedly applied at regular intervals the tell-tale wrinkles return. The product poses no threat to public health. Unless claims were made for it in labelling or advertising to the effect that it possessed the properties of a drug, it would not fall within the definition of a drug as an article "intended to affect the structure of the body," [1] 21 U.S.C. § 321(g) (1).

As Judge Anderson points out, it is settled law that if a product is claimed by its vendor to possess the qualities of a drug, it must be classified as such, in

---

oughly familiar that constant exposure can be presumed to have induced sufficient immunity even in our hypothetical vulnerable consumer (this assumes, *arguendo*, that these promises have exactly the same degree of drug-type connotations as the "face lift without surgery" claim—an assumption which we reject).

11. Cosmetics are defined in the Act as: (1) articles intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body or any part thereof for cleansing, beautifying, promoting attractiveness, or *altering the appearance*, and (2) articles intended for use as a component of any such articles; except that such term shall not include soap. 21 U.S.C. § 321(i). (Emphasis supplied.)

1. Webster defines "structure" as the "Arrangement of parts, or organs, or of constituent tissues or particles in a substance or body." New Collegiate Dictionary, p. 841 (1959). Implicit in the majority opinion is an acceptance of Judge Weinstein's view that words such as "*smoothes* the skin," "*firms* the skin," "*tones* the skin" and "*moisturizes* the skin" do not imply that the product is "intended to affect the *structure* of the body." It is unclear, however, whether the Court would deem the phrase "lifts the skin" to have physiological connotations in the absence of a reference to "surgery" or "puffs under the eyes."

order to assure the public of the protective requirement that a drug be pre-tested and cleared, and that its components be listed on the label (see decisions cited *supra* at p. 239). However, in construing advertising and labelling for the purpose of determining whether the claims made by the vendor require classification of a cosmetic as a drug, we must recognize that the issue to be resolved is the vendor's intent rather than the need for protection of the consumer against fraud. Since 1914 the Federal Trade Commission has possessed broad statutory powers, which it has vigorously exercised, to protect the consumer against economic fraud in the sale of products, whether or not they are classified as "drugs," 15 U.S.C. §§ 45(a) (1) and 52(a); Charles of the Ritz Dist. Corp. v. F.T.C., 143 F.2d 676 (2d Cir. 1944). Regardless whether the product "Sudden Change" is classified as a drug, it continues to be a "cosmetic." If a cosmetic is adulterated or misbranded, it is subject to seizure and its vendor may be prosecuted, 21 U.S.C. §§ 333, 334; and misbranding of a cosmetic is broadly defined as labelling which is "false or misleading *in any particular*" (emphasis added), 21 U.S.C. § 362. When Congress in 1938 expanded the definition of a "drug" in the Food, Drug and Cosmetic Act to include articles "intended to affect the structure * * * of the body," its essential purpose was to protect the public's health rather than its pocketbook. See AMP Incorporated v. Gardner, 389 F. 2d 825, 829 (2d Cir. 1968).[2] As the legislative history of the 1938 revision amply demonstrates, Congress felt that the Act's existing definition of a drug afforded loopholes which would permit the sale of certain types of products, such as remedies for obesity, without the safeguards of pre-testing, clearance and labelling of components, which are designed to protect the consumer against harm to his body. Although there was a

passing reference by Senator Copeland to the existence of "worthless" devices and preparations on the market, Congress enacted separate provisions prohibiting the misbranding of cosmetics, 21 U.S.C. §§ 331, 362, and it was well aware of the Federal Trade Commission's existing broad powers to curb fraudulent advertising.

In view of the existence of ample authority for regulation of cosmetics, it strikes me as unnecessary, in the absence of some imminent danger to public health —and none is suggested here—for the Court to adopt new standards of construction for the purpose of determining whether an article is intended as a "drug" rather than to follow time-proven rules. Yet that is exactly what the Court does here, with the result that it opens up a new—and in my view, unnecessary —avenue for regulation of cosmetics as drugs. If Congress believes that protection of the public requires pretesting and clearance of cosmetics by the Food and Drug Administration (Dept. of Health, Education and Welfare) and that their components be listed on the label, it has the power to act. I do not think the Court should do so by a process of tortuous construction.

It is only by fragmentizing the language used in the labelling and advertising of "Sudden Change," and by applying the "gullible" instead of "reasonable" woman standard, that the Court reaches the conclusion that the vendor "intended" the product to "affect the structure * * of the body," which would render it a "drug," instead of "intended" it to be applied for the purpose of "altering the appearance" of the skin, which is the definition of a cosmetic, 21 U.S.C. § 321(i). The Court's decision rests essentially on two phrases, "Face Lift Without Surgery" and "Lifts the Puffs Under Your Eyes," which it excerpts from the labelling and gives undue emphasis, de-

---

2. In discussing the purposes of the 1938 amendments to the Act, the Court, per Smith, J., there stated:

"That purpose was, very clearly, to keep inadequately tested medical and related products which might cause widespread danger to human life out of interstate commerce."

parting from the elementary principle that the text of the labelling and advertising must be viewed as a whole. "The important criterion is the *net* impression which the advertisement is likely to make upon the general populace" (emphasis added), Charles of the Ritz Dist. Corp. v. F. T. C., 143 F.2d 676 (2d Cir. 1944). It is the "overall impression created" that governs, J. B. Williams Co. v. F. T. C., 381 F.2d 884, 889 (6th Cir. 1967). "Advertisements must be considered in their entirety," Aronberg v. F. T. C., 132 F.2d 165, 167 (7th Cir. 1942). See, in accord, United States v. 47 Bottles, More or Less, 201 F.Supp. 915, 917 (D.N.J. 1962). These cases apply that standard to the question of misleading advertising; when the question of intent is involved it seems to me even more appropriate to look at the net impression conveyed by the advertisements and labels.

Applying the basic standard that the advertising and labelling must be viewed as a whole, the product "Sudden Change" appears as nothing more than a superficial wrinkle smoothing cosmetic or beautifier intended to give the surface of a lady's skin a smoother or more attractive appearance for a few hours. Although the labelling refers to "Face Lift Without Surgery," it also prominently states in bold print that the product "lasts for hours." The advertising further emphasizes the temporary nature of the product's effect upon the skin by stating that it "wears off gradually," that it "does not change the structure or function of the skin in any way," that "it will not eliminate them [wrinkles] permanently," and that if the product is applied "several hours later * * * your skin is firmed and tightened again, and the more you use, the longer your wrinkle-free look will last." The price is $2.95 per bottle.

I find it difficult to believe that any of the fairer sex, whether described as "gullible" or "reasonable," would be led by the description of the product in its entirety, including the puffery, to believe that it is anything more than another one of the many lotions, creams, oils or similar cosmetics which are claimed by vendors to "lift," "tone," "smooth" or "moisturize" the skin. As Judge Weinstein pointed out, if the claim that a product will alter the appearance of the body, such as by "lifting" or "smoothing" the skin, requires that the product be classified as a drug, practically all cosmetics (and indeed articles such as girdles or brassieres) would be required to be so classified. The effect would be to render meaningless the distinction made by Congress between drugs and cosmetics, the latter of which are defined by Congress as articles intended to be applied for the purpose of "altering the appearance of the body," 21 U.S.C. § 321 (i).

It may well be that the existence of fraud upon consumers of such products (whether drugs or cosmetics) should depend upon whether "the ignorant, the unthinking and credulous" would be deceived, *supra* p. 740. The issue before us, however, is not whether consumers may be defrauded by the labelling and enclosures used in connection with the sale of "Sudden Change." The issue is whether the product must be classified as a "drug" which must be pre-tested, cleared and bear a label listing its components. Since that issue turns upon whether the article is *"intended* to affect the structure of the body" (emphasis added), it seems to me that the "gullible" woman standard is both irrelevant and unnecessary, and that the standard should be whether a reasonable person would construe the labelling and advertising as showing that the product was so intended.

To summarize my position, unless a product is in fact a "drug" as defined in the Food, Drug and Cosmetic Act or a reasonable person would conclude from a reading of the label and enclosure as a whole that it is intended to possess the properties of a drug as so defined, I would not classify it as such merely because one or two phrases, taken out of context, imply possible drug properties. The effect of such a course is to draw a line between permissible and impermis-

sible description of cosmetics that is altogether too illusory and shadowy to permit a workable standard, with the result that most cosmetics must be classified as drugs.