**UNITED STATES of America,**
**Appellee,**

**v.**

**Adolphus HOHENSEE, an Individual, Appellant.**

**UNITED STATES of America,**
**Appellee,**

**v.**

**EL RANCHO ADOLPHUS PRODUCTS,**
**Inc., a Corporation, Appellant.**

**UNITED STATES of America,**
**Appellee,**

**v.**

**SCIENTIFIC LIVING, Inc., a Corporation, Appellant.**

**Nos. 11977–11979.**

United States Court of Appeals
Third Circuit.

Argued Nov. 16, 1956.

Decided Jan. 29, 1957.

Rehearing Denied March 1, 1957.

Horace Donnelly, Washington, D. C. (C. Clark Hodgson, Philadelphia, Pa., Raymond Bialkowski, Scranton, Pa., on the brief), for appellants.

William J. Risteau, Dept. of Health, Education and Welfare, Washington, D. C. (Warren Olney, III, Asst. Atty. Gen., J. Julius Levy, U. S. Atty., Scranton, Pa., John T. Grigsby, Atty., Dept. of Justice, Scranton, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and McLAUGHLIN and STALEY, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Appellants were indicted on nine counts for causing the introduction and delivery for introduction into interstate commerce of misbranded drugs, contrary to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 321 et seq.[1]

1. 21 U.S.C.A. Chap. 9, Subchap. II, § 321 (g), (k), (m):
"For the purposes of this chapter
* * * * *
"(g) The term 'drug' means * * *
(2) articles intended for use in the di- agnosis, cure, mitigation, treatment, or prevention of disease in man or other animals;
* * * * *
"(k) The term 'label' means a display of written, printed, or graphic mat-

Counts VIII and IX were withdrawn by the government in the course of the trial and nolle prossed. All three appellants were convicted on the remaining seven counts.

The government's theory and proof involved two parallel sets of incidents. The individual appellant is president of one of the corporate appellants, Scientific Living, Inc. and the moving spirit in both. Counts I, II and III of the indictment concern Hohensee going to a food store in Phoenix, Arizona, advising the proprietor that he intended lecturing on health subjects in Phoenix shortly and seeking his cooperation. Appellant gave the storekeeper leaflets and advertising copy to be distributed and used for arousing interest in the lectures.[2] He provided for stocking El Rancho Adolphus brand products in the health food store. Demand for these products was to be created by the forthcoming lecture series.

Shipments of El Rancho Adolphus products began arriving at the Phoenix store in the latter part of January 1952 and were invoiced from one or the other of the corporate appellants at Scranton, Pennsylvania. The lectures were given

---

ter upon the immediate container of any article;

\* \* \* \* \*

"(m) The term 'labeling' means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."
21 U.S.C.A. Chap. 9, Subchap. III, § 331(a):
"The following acts and the causing thereof are hereby prohibited:
"The introduction or delivery for introduction into interstate commerce of any \* \* \* drug \* \* \* that is \* \* misbranded."
21 U.S.C.A. Chap. 9, Subchap. III, Sec. 333(a):
"Any person who violates any of the provisions of section 301 shall be guilty of a misdemeanor and shall on conviction thereof be subject to imprisonment for not more than one year, or a fine of not more than $1,000, or both such imprisonment and fine; but if the violation is committed after a conviction of such person under this section has become final such person shall be subject to imprisonment for not more than three years, or a fine of not more than $10,000, or both such imprisonment and fine."
21 U.S.C.A. Chap. 9, Subchap. V, § 352(f):
"A drug \* \* \* shall be deemed to be misbranded—
\* \* \* \* \*
"Unless its labeling bears (1) adequate directions for use."
21 U.S.C.A. Chap. 9, Subchap. VII, § 371(a):
"The authority to promulgate regulations for the efficient enforcement of this Act, except as otherwise provided in this section, is hereby vested in the Secretary."
Regulations for the Enforcement of the Federal Food, Drug and Cosmetic Act.
Sec. 1.106, 21 CFR 1.106:
"Drugs and Devices: directions for use—
"(a) Adequate directions for use. 'Adequate directions for use' means directions under which the layman can use a drug or device safely and for the purposes for which it is intended. Directions for use may be inadequate because (among other reasons) of omission, in whole or in part, or incorrect specification of:
"(1) Statements of all conditions, purposes, or uses for which such drug or device is intended, including conditions, purposes, or uses for which it is prescribed, recommended, or suggested in its oral, written, printed, or graphic advertising \* \* \*."

2. The leaflets described the lectures as including "\* \* \* hope-awakening new light on scores of specific conditions which today are the scourge of mankind. What does science say about Cancer? Diabetes? Rheumatism? Liver disorders? Chronic constipation? Colitis? Stomach ulcers? Kidney stones? Kidney disease? Morning mouth? Tooth decay? Bleeding gums? Tuberculosis? Sinusitis? Asthma? Common Cold? Irritability? Vague pains? Scurvy? Rickets? Beri Beri? Glaucoma? Neuritis? Cataracts? Sexual Impotency? Frigidity in Women? Neurotic symptoms? Heart disease? High blood pressure? Low blood pressure? Rebuilding of blood? Anemia? Arteriosclerosis? Hemorrhoids? Insomnia? Fatigue? Foot trouble? Better eyes without glasses? How to conquer premature old age? Better eyes without glasses! A startling revelation by a man who was actually blind! Today he enjoys perfect vision." The newspaper advertisements were similar in context.

by appellant at Phoenix from February 11 to March 6, 1952. At these lectures printed materials were distributed dealing with most chronic diseases and physical complaints, suggesting diets which included large quantities of El Rancho Adolphus products as remedies. According to the testimony, the oral representations of appellant at the lectures, regarding the subject matter of Count I, were astounding; peppermint tea, for example, was recommended for gall stones, colic, flatulence, headache, rheumatism, high blood pressure, athritis, prostate trouble, lumbago, fits, convulsions, colitis, tuberculosis, asthma, pin worms and tape worms. The label on the El Rancho Adolphus brand peppermint tea leaves had only the following directions: "Used as a delicious refreshing table beverage. Take one level teaspoon of Adolphus peppermint for each cup of water, steep for four minutes. Do not boil. Sweeten to taste."

Counts II and III arise out of other products of the Phoenix promotion, namely, wheat germ oil and herb laxative. There were similar fantastic representations of their curative qualities.

Counts IV, V, VI and VII cover the campaign in Denver where Hohensee lectured during the months of July through September 1952. The preliminary arrangements for that city were made by one Miguarder, a government witness at the trial. The local retail outlet for the El Rancho Adolphus products was Leeds Health House, operated by Mrs. Ethel Barnes, who also testified for the government. El Rancho Adolphus brands of concentrated broth, whole wheat, peppermint tea leaves, and wheat germ called by the trade name, "Wheat Hearts", are the products alleged in those counts to have been misrepresented.

Appellants attack the constitutionality of 21 U.S.C.A. § 352(f) (1) on the ground that the statutory language "bears adequate directions for use" with reference to misbranding is too vague, indefinite and uncertain if construed to proscribe their activities. In Kordel v. United States, 1948, 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52, the Supreme Court upheld a conviction where the circumstances were very close to the case at bar. That decision definitely disposes of any question of constitutionality here.

In Kordel promotional materials were shipped separately for the products intended for use as drugs.[3] The Supreme Court reaffirmed its position as outlined in United States v. Dotterweich, 1943, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48, and United States v. Sullivan, 1948, 332 U.S. 689, 68 S.Ct. 331, 92 L.Ed. 297, that this legislation be given a liberal interpretation to effectuate its high purpose of protecting unwary consumers in vital matters of health. The intended uses of the products in the present issue as in Kordel were to cure, ameliorate or prevent diseases. The evidence to prove their uses included both graphic materials distributed and testimony of oral representations to users and prospective users. The latter are no less relevant on the question than the former. Both show that the products shipped were to be used as drugs. Alberty Foods Products v. United States, 9 Cir., 1952, 194 F.2d 463. The crime is that the labels on the containers were insufficient for the purposes for which the products were to be used. The statute prohibits the shipment of any products that are to be used as drugs, and are inadequately labeled for that purpose.

◼ Appellants challenge the sufficiency of the evidence to support the verdict. Their main thrust is against the time sequence of the various events in both Phoenix and Denver where the evidence of misbranding is primarily the oral representations and printed

---

3. United States v. Oruez, D.C.E.D.Ill. 1956, 144 F.Supp. 229 involves a conviction based solely on evidence of oral representations. Weeks v. United States, 1918, 245 U.S. 618, 38 S.Ct. 219, 62 L.Ed. 513, affirmed a food misbranding conviction based on oral representations.

material distributed at the lectures. It is argued that since the lectures occurred some weeks after the products were introduced into interstate commerce, there was no proof of a medicinal or curative purpose or use of the products at the time of the shipments from Scranton to Phoenix and Denver. That problem was decided in Kordel, supra. There, the food products, including vitamins, minerals and herbs, were labeled innocuously as health foods. The advertising materials which proved the products were drugs for the amelioration of various ills were shipped separately both before and after the products.[4] The Supreme Court specifically held that:

"The false and misleading literature in the present case was designed for use in the distribution and sale of the drug, and it was so used. The fact that it went in a different mail was wholly irrelevant whether we judge the transaction by purpose or result. And to say that the prior or subsequent shipment of the literature disproves that it 'is' misbranded when introduced into commerce within the meaning of § 301(a), is to overlook the integrated nature of the transactions established in this case.

"Moreover, the fact that some of the booklets carried a selling price is immaterial on the facts shown here. As stated by the Court of Appeals, the booklets and drugs were nonetheless interdependent; they were parts of an integrated distribution program. The Act cannot be circumvented by the easy device of a 'sale' of the advertising matter where the advertising performs the function of labeling."
[335 U.S. 345, 69 S.Ct. 110.]

Appellants further contend that false advertising is exclusively within the jurisdiction of the Federal Trade Commission. That argument was rejected in Kordel.

■ Hohensee insists the principle that intent is not an element of the offenses charged[5] should not have been applied to him since as a second offender, if convicted, he would be subject to felony penalties. His guilt falls into the felony category not because of evil intent but because of the maximum sentence of three years for second offenders provided by Section 333(a) of 21 U.S.C.A. The Act imposes criminal sanctions as a means of regulating activities so dangerous to the public welfare as not to permit of exception for good faith or ignorance. A person acts at his peril in this field. United States v. Dotterweich, supra. The instant facts are well within the rule established by United States v. Balint, 1922, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604, which sustained a maximum sentence of five years under another no intent statute, the Narcotic Act of 1914, 38 Stat. 785, 26 U.S.C. §§ 2550 et seq. 3220 et seq. And see United States v. Behrman, 1922, 258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619.

■ Hohensee had been convicted previously under the Federal Food, Drug and Cosmetic Act and that was pleaded in the indictment in order to call forth the second offender penalties under Section 333(a) of 21 U.S.C.A. Knowledge of the prior conviction was meticulously kept from the jury and reference to it was blocked out of the copy of the indictment which went to the jury room. We find that no prejudice to the accused resulted from the procedure followed.

■ Appellants suggest they were seriously harmed when, a week prior to the start of the trial, in the presence of the jury panel, Hohensee, explaining that his attorney was ill, was argu-

---

4. The dissent points out "The evidence under one count was that the drugs were shipped July 10, 1942, while the booklets * * * were sent a year and half later, January 18, 1944."

5. See Morissette v. United States, 1952, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288, for an exhaustive discussion of the principle.

ing pro se for a bill of particulars and the judge commented "I don't think you need a lawyer." The record does not reveal any prejudicial connotation. Presumably it was an offhand complimentary pleasantry coupled with an indication that the court would protect his interests. In any event the transcript shows three of the defense attorneys in court at the time with two of them seemingly discussing the information desired.

Appellants also complain of a remark (lifted out of a sentence) the judge made at a sidebar conference during the trial. A Food and Drug inspector was on the witness stand. She testified she had attended three of Hohensee's Denver lectures. *Prior to any testimony of what Hohensee had said,* appellants, with the court's permission, objected to all such testimony as "incompetent, irrelevant and immaterial to prove the allegations of the indictment, and, furthermore, oral statements cannot constitute misbranding of an article." According to the transcript the court then stated at this sidebar colloquy with counsel, "If I uphold your objection we would dismiss this jury, but I cannot do it with all the preparation in this case. Why this man must be a terrible person; I do not know, but anyway I am not going to form any opinion at all. It is none of my business, so you just go ahead and I will overrule you."

On occasion, stream of thought language, wrenched away from its setting, may not seem too clear later but that difficulty is not present in the above quoted statement. Manifestly the judge, feeling that the first part of his offhand observation did not properly express his state of mind, remedied it immediately and in the same sentence. No motion was made at the time or thereafter concerning it. The only purpose of counsel coming to the side of the bench was to prevent the jury overhearing the motion. There is no evidence that purpose failed.

A third objection is voiced to the court's expressions with reference to the cost of the trial. In denying the motions for acquittal, the court did allude to the large trial expense but in its next sentence and the same paragraph stated "If I determine that I am in error about this (the denial of the motions) at any time I shall gladly grant a new trial, or even enter a judgment of acquittal, if I think I should * * *." Of the two other allusions to trial cost in appellants' appendix, one has to do with the court trying to narrow the trial scope. In the other, the court, at considerable length, rejected the government's plea not to postpone the trial at the defense request. The government urged it had expended large sums of money in preparation. The court concluded its decision to allow the continuance by saying:

"Now, this all means that the preservation of freedom is very expensive, just like everything else, more so every day, and it always has been. So I am not going to sustain the objections to the motion because of the expense, and I will grant the motion for a continuance, and I will fix November 29, 1954 at 2 o'clock in the afternoon for the trial of this case."

Appellants assert the district attorney prevented a fair trial to them by asking leading questions. The one illustration of these in appellants' appendix shows their objection to the particular question was sustained without argument. As to several remarks of the district attorney, now protested, appellants have not bothered to set out the record of these in their appendix. Those that are shown do not evidence substantial harm, individually or collectively.

Appellants before us assail the government summation but made no objection to it during its progress or after it had been concluded; examining it we do not find that it substantially exceeded fair inferences from the evi-

dence. Its final note stressed that the government's concern was " * * * *with the misbranding of these drugs and we want them properly labeled."* (Emphasis supplied). As he finished his summation government counsel said to the jury, "All I ask you is that you render a fair and proper verdict in this case * * *." In the thorough and scrupulously fair charge, among many other things, the court said:

> "In considering the evidence before you your attention is directed to the fact that not all matters coming to your attention in this trial can be considered by you as evidence. The indictment, the opening remarks of counsel, the arguments of counsel, the remarks of counsel, and the remarks of the Court during the trial of the case are not evidence and are not to be considered by you as such in determining the facts of the case."

We have examined all other points of appellants. They do not raise substantial questions and need not be discussed at length.

The judgments of the district court will be affirmed.

On Motion for Rehearing.

PER CURIAM.

The petition for rehearing contains nothing of merit which has not been heretofore presented to and considered by this court.

There is a copy of an affidavit, executed February 11, 1957, annexed to the petition. It is submitted by appellants as an example of other *affidavits* which they state they are prepared to produce. It characterizes language, tone, range of voice and manner of the trial judge on two occasions; the first, during a pretrial motion and the second, during the course of the trial. Both those incidents were argued fully and disposed of specifically by our opinion in the case. The material offered was never before the trial court. It is entirely outside the record. In those circumstances the deliberate attempt to bring it before this court is inexcusable.

The petition for rehearing will be denied.