**UNITED STATES of America**
**v.**
**Dennis Eugene TINNEY.**
**Crim. No. 69–376.**

United States District Court,
E. D. Pennsylvania.

April 13, 1972.

Victor L. Schwartz, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Herbert G. Hardin, Milton S. Leidner, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

HIGGINBOTHAM, District Judge.

### I.

After two highly contested trials on a bank robbery indictment the defendant now seeks a motion for judgment of acquittal as to the one count on which he was found guilty. Defendant has not filed a motion for a new trial.

For the reasons hereinafter noted, I find that defendant has failed to meet the burden required for a judgment of acquittal.[1]

On November 7, 1969, Dennis Eugene Tinney (hereinafter referred to as the defendant, or Tinney) and five co-defendants were indicted for conspiracy, and bank robbery pursuant to Title 18, United States Code § 2113(a), (b), and (d). Initially, all defendants entered pleas of "Not Guilty." Subsequently, on December 16, 1969, Lucky Allen Johnson (hereinafter referred to as "Johnson"), a co-defendant under the same indictment, changed his plea to guilty. The first trial was held before the Honorable Harold K. Wood from January 21 to January 27, 1970. At that trial Johnson testified extensively against defendants Sellers and Tinney.[2]

On the last day of the first trial and prior to Judge Wood's instructions to the jury, defendant Tinney was late for trial. Thus, Judge Wood appropriately granted a withdrawal of the jury as to defendant Tinney, but submitted Sellers' case to the jury. Thereafter, the jury failed to agree on a verdict as to defendant Sellers, and Judge Wood accordingly declared a mistrial. (See N.T., Pages 541, 548 and 549.) By reason of the other trial commitments of Judge Wood, I agreed to take this series of cases (as to defendants Tinney and Sellers) for a retrial pursuant to Judge Wood's approval. During the course of the second trial, defendant Sellers changed his plea to guilty to the conspiracy count contained in the indictment (Count I). (See N.T., pages 101 through 120.) Thereafter, Sellers was subsequently called as a witness for the government and testified against Tinney. On February 3, 1971, the jury returned a unanimous verdict of "Guilty" against Tinney on Count I (conspiracy) of the indictment. Tinney was found "not guilty" on the remaining substantive counts of the indictment.

At both the first and second trials defendant Tinney was represented by Milton Leidner, Esquire, who argued defendant's case with unlimited zeal and effectiveness. At the conclusion of the second trial, Mr. Leidner requested permission to withdraw from the case because of defendant's inability to pay for his professional services. (N.T., pages 551–553.) This request was granted. A few days after the trial, Mr. Leidner had a heart attack and several extensions were granted for the filing of the normal post trial motions. (See Docket Entries Nos. 59, 61 and 62.) The motion ultimately filed was limited to a motion for judgment of acquittal, and counsel did *not* file a motion for a new trial. (See Doc. No. 69, filed May 10, 1971.) In addition, to the aforementioned delays, there were unavoidable delays in the transcription of the notes of testimony; still further delay was caused by the extensive court commitments of defendant's present counsel. Thus, the matter was not argued before

---

1. This Opinion and Order constitutes my findings of fact and conclusions of law pursuant to Rule 23(c) of Federal Rules of Criminal Procedure.

2. See N.T., pages 339, et seq. and pages 495–496, dated January 27, 1970.

me until December 3, 1971. It should be noted, however, that defendant has not been in custody during this period because he posted surety bail.

██ At the outset I must emphasize again that defendant has filed a motion for judgment of acquittal. The standard for evaluating such a motion is not helpful to the defendant. In viewing such a motion I must review the evidence "in a light most favorable to the government."[3] This standard is quite different from that which is applied in determining a motion for a new trial. In the latter motion a trial judge has broader discretionary power. I do not know why counsel filed *only* a motion for judgment of acquittal. Maybe he reasoned that Tinney, having had two prior trials, would stand no better chance of acquittal by a third jury. I do not suggest that I would have been inclined to grant such a motion for a new trial if timely filed, however, the critical point is that I now have no jurisdiction to grant a motion for a new trial.

As noted by the Advisory Committee on Criminal Rules of the Judicial Conference of the United States in their comments on Rule 33 of the Rules of Criminal Procedure:

"The amendments . . . make it clear that a judge has no power to order a new trial on his own motion, that he can act only in response to a motion timely made by a defendant."

Thus, just six weeks ago in United States v. Newman, 456 F.2d 668, filed February 24, 1972, the Court of Appeals of this Circuit held that it would grant a writ of mandamus against a United States District Judge who had granted a new trial for reasons which had not been listed in defendant's motion for a new trial. The Court stated, *inter alia:*

"Since it is, therefore, clear that the defendant in this case could not have amended his motion for a new trial to include a new ground after the seven-day period prescribed in Rule 33 had expired, it would be entirely inconsistent with the purpose of the 1966 amendments to Rule 33 to allow the district court to grant a new trial motion four and one-half months after this seven-day period has elapsed for reasons advanced *sua sponte* by the court."

A fortiori, this Court cannot grant a motion for a new trial, where, as here, not even a motion for a new trial has been filed and over fourteen months have elapsed since the jury's verdict.

As a basis for his motion for judgment of acquittal, defendant asserts the following grounds: First, he contends that the admission of the testimony of Lucky Allen Johnson resulted in his conviction. Secondly, he argues, that the Court "coerced" the jury into reaching a compromise verdict. I will review and discuss these principal contentions of the defendant *seriatim.*

## II.

### THE TESTIMONY OF JOHNSON

██ Lucky Allen Johnson, as previously noted, had pleaded guilty on December 19, 1969, and had testified extensively in the first trial held in January 1970. Unfortunately, the high drama of this trial can never be fully reflected by the written record. It appears that Johnson was apparently kept in the cell room of the Marshal's Office for a few days during the course of

---

3. The evidentiary standard for granting a motion for judgment of acquittal was most recently delineated by the Court of Appeals for the Third Circuit in United States v. Feldman, 425 F.2d 688 (3rd Cir. 1970):

"On a motion for judgment of acquittal at the close of the Government's case, the evidence and the inferences to be drawn from it must be taken *in [a] light most favorable to the Government.* (citations omitted) . . . *the sufficiency of the evidence must be judged upon the record as a whole.*" p. 692 (Emphasis added.)

See also, United States v. Laurelli, 293 F. 2d 830 (3rd Cir. 1961); United States v. Hohensee, 243 F.2d 367 (3rd Cir. 1957).

Tinney's second trial. When cross-examining identification witnesses, Tinney's defense counsel would request that Johnson be brought into the court-room.[4] In the presence of the jury, Johnson was walked in by U. S. Marshals and circled the trial area. Of course, the jury, both counsel, and witnesses riveted their attention on him. No questions were asked of him, and the courtroom was quiet during Johnson's sojourn; Johnson made no comments during these "exhibitions" for purposes of identification. Understandably Johnson could have felt that he was like an object in the zoo being paraded for observation with no reasons given for the parade. When he was finally called to testify, it was not surprising that in his own mind he might have felt that he had been subjected to harassment; for Johnson had testified in a prior trial where he had been subjected to dramatic, extensive, and unsympathetic cross-examination. Moreover, he had already pleaded guilty to the crime, and had been sentenced. When Johnson finally arrived at the witness stand in this case on January 26, 1971, it was at least the third time in three court days [5] that Johnson had appeared in Court. I must quote, perhaps too extensively, the record as to what transpired when Mr. Johnson was brought into the Court on the two prior occasions before his testimony of January 26, 1971.

On January 21, 1971, during the cross-examination by defense counsel of a government witness, the following events occurred:

"MR. LEIDNER: May we approach the bench? I don't want to propound the next question.

"THE COURT: Very well.

"(And at side bar:)

"Mr. LEIDNER: I am going to ask the Government to produce Johnson so she can look at him.

"THE COURT: Is Mr. Johnson in the building?

"MR. SCHWARTZ: Yes, sir, he is in the Marshal's office.

"THE COURT: O.K. Have him brought down.

"(Concluded at side bar.)

"BY MR. LEIDNER:

"Q. Mrs. Dimmick, someone is going to be produced in the courtroom, and I want you to look at him closely, and no questions will be asked you in his presence, and I don't want you to make any statement in his presence.

Now, before this man gets down here when you saw the two men in your rear-view mirror I think you testified you got out of your car again because you were inquisitive or curious as to who they were and where they went; is that correct?

"A. That is correct."

(N.T., pp. 141–142.)

\*    \*    \*    \*    \*    \*

"(A man enters the courtroom.)

"MR. LEIDNER: Your Honor, may I have the gentleman who was just brought in the courtroom brought up here for just about ten seconds?

"THE COURT: Very well. Do you want to bring him up, Marshal?

(Man approaches the witness.)

"THE COURT: All right. Thank you, gentlemen. You can take him back."

(N.T., pp. 143–144.)

Again, on the same day, defense counsel during cross-examination of defendant Sellers, made the following statements and requests:

"Q Who was the other man that was with you in there that had the yellow shirt on?

"A Allen Johnson.

"Q Is that the man that was brought in to court this morning?

"A I didn't see his face too good, but it looked like him.

"Q You didn't see Mr. Johnson?

---

4. See note 5, *infra.*

5. See N.T. pp. 141–144, 207–213, and pp. 426–428; that is Johnson was brought

into open court on Friday, January 21, 1971, on two separate occasions, and finally to testify on January 26, 1971.

THE COURT: He said he didn't see his face.

"BY MR. LEIDNER:

"Q You didn't?

"A No, I didn't see his face too good. He came in this way and went out that way. I was facing this way. He came right down the aisle and stood here.

"Q He came in the rear door?

"A No, he came in the back door and down that aisle there. I know he went out that door. I didn't see where he came from.

"THE COURT: Let's proceed, Mr. Leidner . .

"MR. LEIDNER: May I have him brought down again.

"MR. SCHWARTZ: Objection, Your Honor.

"THE COURT: I will have him brought down because I would really not want this case to be subject to a new trial on an irrelevant matter. I will have him brought down.

"Mrs. Fears, call up the Marshal and tell him to bring down Lucky Allen Johnson.

"Please proceed."

(N.T., pp. 206–207.)

* * * * * *

"MR. LEIDNER: If Your Honor, please, may the individual be brought in?

"THE COURT: Yes.

"(Man enters courtroom.)

"THE COURT: You may be seated, gentlemen, back there.

"MR. LEIDNER: And he may leave the room now, Your Honor. That was the only purpose. The individual has just been brought in.

"THE COURT: All right. Thank you, gentlemen.

"BY MR. LEIDNER:

"Q Is the person that just was brought in by the United States Marshals and has just left the room after being in here some 10 or 15 seconds, who is he?

"A That is Allen Lucky Johnson.

"Q Is that the person that was with you on the morning or the time of this robbery?

"A Yes, sir.

"Q And is he the person that was wearing the yellow sweatshirt?

"A Yes."

(N.T., pp. 213–214.)

In addition to the preceding requests by defense counsel to produce Johnson in open court for identification purposes, other references were made to Johnson by defense counsel in the jury's presence.[6] After all of the above events had transpired, Mr. Johnson entered the courtroom, took the witness stand and the following took place:

"MR. SCHWARTZ: With the Court's permission the government would like to call as its next witness Lucky Allen Johnson.

"THE COURT: Bring him in.

"(Lucky Allen Johnson called.)

"(The Deputy Clerk Administered the oath to the witness.)

"THE WITNESS: I told the FBI Agent I wouldn't give any testimony, not one. I don't even know why they bring me down here, Your Honor.

"THE COURT: You aren't asked to testify, do you swear to tell the truth, the whole truth and nothing but the truth?

"THE WITNESS: If I say anything it is going to be the truth.

"THE COURT: All right.

"THE WITNESS: I don't speak unless it is the truth.

"THE CLERK: Will you state your full name for the record, please?

"THE WITNESS: Lucky Allen Johnson.

"THE CLERK: You may be seated.

"THE WITNESS: Thank you."

(N.T., pp. 425–426.)

---

6. E. g., see N.T., 383, 386 and 392.

## DIRECT EXAMINATION

"BY MR. SCHWARTZ:

"Q  Mr. Johnson, were you charged with participating in the robbery of the Concora Federal Credit Union on July 10, 1969?

"A  That is what I am serving time for, *yes*.

"Q  Did you plead guilty to that charge?

"A  *Sure, I did*.

Your Honor, before the proceeding I would like to request counsel because I told him (indicating) and him (indicating) that I wasn't going to say anything up here because I think it is *some type of harrassment* that is going on. They been bringing me down every day. *My nerves are shot*. I been going back and forth, back and forth. It is kind of depressing.

"THE COURT: *On the aspect of harassment, it wasn't at least my intention to harass you*. There was a question in *terms of identification and the only way that specific issue could be answered would be by someone seeing you*. So that you weren't brought down to harass, but because the other defendants had rights, and in this case there is a charge of conspiracy and in the charge of conspiracy you were charged, as you know, along with other individuals. *So that in the proof of the conspiracy claim that is why you were called into the courtroom, not to harass*.

Now if your position is that you want a lawyer to advise you of your rights I will see if I can arrange to get a Voluntary Defender.

"THE WITNESS: Yes, anything."
(N.T., pp. 425, et seq.)
(Emphasis added.)

I was surprised when the witness exclaimed: "Your Honor, before the proceeding I would like to request counsel because I told him (indicating) and him (indicating) that I wasn't going to say anything up here because I think it is some type of harassment that is going on. They been bringing me down every day. My nerves are shot. I been going back and forth, back and forth. It is kind of depressing."  (N.T., p. 426.)

At this point, as a trial judge, I was faced with a difficult dilemma. Until this statement was made by Johnson, I had assumed that the witness was merely reluctant to testify because he thought that he was being harassed, I did not think that he was basing his reluctance on any constitutional ground. This belief was reasonable since the law clearly holds that Johnson would not have been permitted to claim the privilege against self-incrimination as to the precise facts of this robbery—where he had already pleaded guilty to the indictment. If he had never testified at the earlier trial, there would have been no basis for his claim of self-incrimination as to any questions asked about the robbery in issue. When this line of testimony began I did not anticipate any possible constitutional claim premised upon the assertion that Johnson might have perjured himself at the first trial. And, indeed the gravamen of his original objections did not appear to be grounded on any constitutional basis, but rather it was predicated on an assumption that he was being harassed by the government.

Defendant now argues in his motion that the trial court committed error by allowing Johnson to testify as a witness for the prosecution, and that the prosecutor had "actual or constructive knowledge," that Johnson would refuse to testify. Further, he argues that the limited testimony given by Johnson created an unfavorable inference upon his case. In support of this conclusion, defendant relies on the cases of United States v. Maloney, 262 F.2d 535 (2d Cir. 1959); United States ex rel. Fournier v. Pinto, 408 F.2d 539 (3rd Cir. 1969).[7] I have some difficulty in finding that a significant unfavorable inference was created from the two questions which were asked of Johnson; he was asked whether he had been charged with

---

7.  These cases will be discussed in detail, infra, at page 1153.

participating in the robbery in issue and whether he had pleaded guilty. These two questions did not raise startling new issues for the jury because (1) there had been previous testimony identifying Johnson to the robbery, and (2) by the manner in which he had been previously brought into court by the Marshals, the jury probably surmised that Johnson was in custody on some charge.

Thus, from a standpoint of prejudice, this case is in a different posture than it would have been if Johnson had testified that Tinney had participated in the robbery and after having made these charges against Tinney he had refused to testify further; for if the latter had occurred, I would have granted a withdrawal of the jury. However, with the *actual* incident in issue, unfortunate though it was, I did not feel that it had sufficient magnitude to warrant a withdrawal of the jury.

The government, on the other hand, in opposing defendant's motion asserts that at the time "Johnson" was called as a witness for the prosecution it had no reason to believe that he could refuse to testify. This belief was premised upon the fact that "Johnson" had already pleaded guilty to the crime in question, and had been duly sentenced. Thus, removing the availability of his privilege against self-incrimination. See, United States v. Romero, 249 F.2d 371, 375 (2d Cir. 1957).

In reviewing the entire trial record in a light most favorable to the government I find that the admitted testimony of Johnson was but a "minor lapse" in a long and difficult trial. Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). Moreover, I find that there was no deliberate attempt by the prosecution to make "capital" [8] out of Johnson's refusal to testify. In the setting of this trial my first impression was that Johnson was reluctant to testify because of his feeling of harassment by the government. However, out of an abundance of caution, I appointed counsel for Johnson, had extensive argument in the absence of the jury on this issue, and Johnson was ultimately withdrawn from the case.[9] In addition, the jury was given cautionary instructions by me.[10] I find that defense counsel had ample notice that "Johnson" would be called by the prosecution, but failed to interject timely objections. (E. g., N.T. pp. 398–400, and again at pages 404 and 414.) Further, I find that Johnson's name and his person had been mentioned and exhibited in the presence of the jury on several occasions, before he was called as a government witness.

Moreover, I find that no substantial harm was caused to defendant's case by the admission of Johnson's limited testimony. This conclusion is buttressed by the many cautionary instructions given to the jury by me throughout the trial on the testimony of *any* co-defendant.[11] Moreover, I allowed defense counsel in his closing argument to the jury to comment liberally in the government's withdrawal of "Johnson" as a witness. While at the same time, I denied the government the right to comment on the testimony of "Johnson" or his subsequent withdrawal as a government witness. Therefore, I conclude that the trial record, as a whole, does not support defendant's motion for a judgment of acquittal.

Defendant disagrees, and asserts in support of his motion for a judgment of acquittal the cases of United States v. Maloney, 262 F.2d 535 (2d Cir. 1959);

8. See, Affidavit of Victor L. Schwartz, Esq., Ass't. U. S. Attorney for Eastern District of Pa. (Doc. No. 56).

9. See N.T., pp. 438–462.

10. See N.T., pp. 479–480 and note 11, below.

11. The jury was charged in this regard: ". . . I also instruct you that you must not make an adverse *inference against the defendant because after Lucky Allen Johnson took the stand and was asked two questions he was withdrawn.*" (Emphasis added.) (N. T., p. 520. See also: N.T. 17, 479–480.)

United States ex rel. Fournier v. Pinto, 408 F.2d 539 (3d Cir. 1969).

In *Maloney, supra,* defendant was convicted by a jury of conspiracy. "Parker", a co-defendant of Maloney's, testified as a witness for the prosecution *before he had been sentenced.* In addition, his testimony was the "main reliance" of the prosecution. Because of the factual circumstances under which his testimony was given it was unlikely the jury would have believed his uncorroborated testimony. Thus, in an effort to support Parker's testimony the prosecution called three corroborating witnesses. The prosecution had "actual knowledge" that the three corroborating witnesses would invoke the privilege against self-incrimination, as they did. Moreover, the prosecution had called the witnesses in an effort to create an unfavorable inference to defendant's case. In this regard the Court of Appeals for the Second Circuit stated:

"When a witness claims his privilege, a natural, indeed an almost inevitable, inference arises as to what would have been his answer if he had not refused. If the prosecution *knows* when it puts the question that he will claim the privilege, it is charged with notice of the *probable effect of his refusal upon the jury's mind* . . . Moreover, the *prosecution on its summation conceded that, in the case of Parkhurst and Mascali, it had known, or 'anticipated',* that the witnesses would refuse to answer." (262 F.2d p. 537) (Emphasis added.)

In *Pinto, supra,* which cites the above language of *Maloney,* verbatim, the crucial and controlling factor as in *Maloney,* was the prosecution's "actual" knowledge that the witness it called would invoke his constitutional privilege against self-incrimination. The Court held that to call a witness for the purpose of creating an unfavorable inference against a defendant who could not cross-examine the witness was reversible error. The Court went on to limit its decision by stating: ". . . the circumstances of a given case rather than a rule of thumb are . . . determinative . . .".

In the application of *Maloney* and *Pinto, supra,* to the record of this case I find that they support my conclusion that defendant received a "fair trial." *Maloney* and *Pinto, supra,* hold on their facts that in order for a defendant to be denied a fair trial two elements must exist: First, the facts of a given case must indicate "prosecutorial misconduct," that is, the government must make a conscientious and flagrant effort to build its case on "inferences arising from [the exercise] of the testimonial privilege" against self-incrimination. Secondly, both cases hold that the inferences created by the exercise of the privilege must add "critical weight" to the prosecution's case.

I have already found the prosecution did not reasonably believe at the time that "Johnson" was called that he had a right *not* to testify. Apparently, the prosecution, as well as the defense, assumed that because Johnson had pleaded guilty to the crime in question, his Fifth Amendment privilege was nonexistent. Moreover, it must be noted that this case is different from *Maloney* and *Pinto, supra,* in another crucial aspect, and that is, the limited testimony (two questions and answers) of Johnson as heard by the jury can in no way be construed as a factor which added "critical weight" to the prosecution's case. The testimony of Sellers alone was sufficient to sustain defendant's conviction. Moreover, this case is further distinguishable from *Pinto,* in that no cautionary instructions were given by the trial judge in defendant's behalf.

Namet v. United States, 373 U.S. 179, 188, 83 S.Ct. 1151, 1155, 10 L.Ed.2d 278 (1963) is factually and legally similar to issues involved in this case, particularly with regard to the actual knowledge of the prosecutor at the time he called a government witness. Mr. Justice Stewart, speaking for the Supreme Court, said:

"In this case, the *prosecutor initially did not believe that the Kahns could properly invoke their privilege against self-incrimination, reasoning with*

*some justification that their plea of guilty to the gambling charge would erase any testimonial privileges as to that conduct.* His view of the law was supported by substantial authority, cf. Reina v. United States, 364 U.S. 507, 513, 81 S.Ct. 260, 264, 5 L.Ed.2d 249, and was in fact upheld by the trial judge." (Emphasis added.)

The Court went on to state:

*"We cannot find that these few lapses, when viewed in the context of the entire trial, amounted to planned or deliberate attempts by the Government to make capital out of witnesses' refusals to testify.* We are particularly reluctant to fasten such motives on the Government's conduct when, as here, *defense counsel not only failed to object on behalf of the defendant, but in many instances actually acquiesced in the procedure as soon as the rights of the witnesses were secured."* (Emphasis added.)

Therefore, I hold the error alleged by defendant was one which "does not affect [any] substantial rights" of his to a fair trial. Accordingly, I rule that the admission of the testimony of Johnson, if error, was "harmless beyond a reasonable doubt." Chapman v. State of California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); see also: United States v. Murray, 445 F.2d 1171, 1176 (3rd Cir. 1971).

### III.

### THE JURY'S DELIBERATIONS

■ Alternatively, and in support of his motion for a judgment of acquittal defendant asserts:

"The Court in reconvening the jury on the third day of deliberation was in fact and in law coercing the said jury into reaching a verdict."[12]

The relevant facts which underlie this assertion by defendant are as follows:

The jury after hearing testimony on January 22, 25, 26, 1971, and February 1, 1971, retired to deliberate at 3:15 P.M., on the latter date; they deliberated until 5:29 P.M. that day. Deliberations were resumed by the jury on February 2, 1971 at 10:15 A.M. and continued until approximately 4:11 P.M. The jury at that time was returned to the courtroom, but before the jury entered the courtroom the following transpired at "side bar":

"THE COURT: Gentlemen, this jury has been deliberating continuously since about ten after 10:00. It is now 4:00. I have some further commitments, and I would be inclined to either bring the jury back tomorrow morning or to discharge them.

"What is your position on this generally, Mr. Leidner? Do you oppose—

"MR. LEIDNER: I oppose bringing them back tomorrow. They have been deliberating both today and yesterday, approximately two hours yesterday.

"THE COURT: Are you requesting that they be kept here?

"MR. LEIDNER: No. If they can't agree at this time I am asking they be discharged.

"MR. SCHWARTZ: The Government opposes that, Your Honor. Certainly unless the jury—an inquiry should be made of the jury whether they feel that they can come to a decision.

"THE COURT: Very well. Thank you, gentlemen. We will put the jury in the box.

(Concluded at side bar.)
(N.T., pp. 534–535.)

The jury was then returned to the courtroom and the following colloquy occurred:

(Jury in at 4:11 P.M.)

THE COURT: Good-afternoon, ladies and gentlemen.

I am going to ask a question. I am going to ask only the Foreman to an-

---

12. Doc. No. 69, Motion for Judgment of Acquittal, para. 6.

swer. You have been deliberating since I think I sent you out around ten after 10:00. It is now ten after 4:00.

To the Foreman: Do you believe that further *deliberation would be of value in reaching a unanimous verdict, not indicating which way it would go? Do you think more time in deliberation would be helpful?*

"THE FOREMAN: (Juror No. 1): *Yes, sir. I do.*

"THE COURT: What we will do is, ladies and getlemen of the jury, I am going to send you home. Don't discuss this case with anyone as I have previously instructed you. I am going to ask you to come back tomorrow at 10:00 o'clock.

"Now I really want to make it clear to you. *I am not trying to be coercive. I am not trying to get anyone to express a change against their will.* So that I don't want you to feel as if you are going to be kept here indefinitely. I can assure you if you don't agree on a verdict tomorrow I am not going to keep you beyond tomorrow so that *you will not have the impression that you are just going to be kept here until you enter a verdict. I will ask you to come back tomorrow.*" (N.T., pp. 535–536). (Emphasis added.)

The following day, February 3, 1971, the jury began its deliberations at 10:02 A.M. and continued until approximately 12:24 P.M., at which time they rendered their unanimous verdict of guilty on the conspiracy count. At the request of defense counsel the jury was polled and each juror announced his verdict in comformity with that announced by the foreman. (N.T., p. 545.)

Certainly, defendant cannot complain that the above colloquy was anything more than an impartial inquiry into the state of the deliberations. It would seem

that such an inquiry was not only proper, but was required in light of the extended trial of this case. Moreover, it is my finding that the jury arrived at its verdict without being coerced by the Court. This finding is buttressed by the fact that the jurors when individually polled were resolute in announcing their individual verdicts.

The fact that I exercised my discretion to allow the jury to continue to deliberate is *not* a basis for granting a judgment of acquittal. Moreover, when viewed in light of the fact that this was a second trial with extended testimony by all parties the time the jury "actually spent" in deliberations was not unreasonable.[13]

## IV.

### CONCLUSION

Upon review of this entire case, I believe that defendant had a fair trial. The Supreme Court has repeatedly advised us that "[a] defendant is entitled to a fair trial but not a perfect one." Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968).[14] This case exemplified the realities of trial; I do not suggest that it was flawless but I think it was fair.

In United States v. Bamberger, 456 F.2d 1119, filed December 7, 1971 (3d Cir. 1971), five defendants were on trial for bank robbery, one co-defendant (Crapps) complained that he was denied a fair trial because the disruptive plays of other defendants prejudiced his right to a fair trial, as a passive defendant. "The unfortunate demeanor of the [other] defendants themselves, their actions and continuous interruptions" was climaxed by a defendant (Bamberger) grabbing and eating a slip of paper which constituted a government's exhibit. While in *Bamberger* there was a different type of outburst, involving a co-defendant on trial, rather than the incident here in-

---

13. The *actual time* spent deliberating was approximately seven (7) to eight (8) hours; Total time spent was not three days, as defendant asserts, but rather ten hours, encompassing three trial days. (See N.T., February 1, 2 and 3, 1971).

14. See also: Lutwak v. United States, 344 U.S. 604 at 619, 73 S.Ct. 481, 97 L.Ed. 593 (1953); United States v. Chicarelli, 445 F.2d 1111 (3rd Cir. 1971).

volving a co-defendant who had pleaded guilty, the rationale of the *Bamberger* case is relevant to the instant matter, for the Court noted:

"Courtroom outbursts and disruptions, lately occurring with increased frequency, although regrettable and deplorable, cannot be seized upon in and of themselves as justifications for retrials. 'If such conduct by a co-defendant on trial were held to require a retrial it might never be possible to conclude a trial involving more than one defendant; it would provide an easy device for defendants to provoke mistrials whenever they might choose to do so.' United States v. Aviles, 274 F.2d 179, 193 (2d Cir.), cert. denied sub nom. Evola v. United States, 362 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960).

"This issue presents a delicate balancing of the right of a passive co-defendant to have his cause determined in an atmosphere free of inflammatory speech and gesture, society's interest in speedy trials for those accused of crime, the realities of sound judicial administration, and a consideration of convenience to witnesses. The accommodation of these countervailing considerations is entrusted to the trial judge. So long as he accords the necessary protection to the passive defendant within the parameters of sound judicial discretion we should not disturb his decision. We find no abuse of discretion here."

The "outburst" of Johnson was not as egregious as the "outburst" of Bamberger's verbal tirades and his finally eating the Government's exhibit. If as to Crapps there was an inadequate substantive basis for his request for a new trial, because of Bamberger's contumacious conduct—certainly here there is an inadequate substance to Tinney's request that he should be granted a judgment of acquittal.

Thus, for all of the aforementioned reasons, defendant's motion for a judgment of acquittal is hereby denied.